**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**
**CIVIL DIVISION**

DAVID PASTUSZEK and                     :
BRENDA PASTUSZEK, h/w                    :          JURY TRIAL DEMANDED
                                        :
                    Plaintiffs          :
          vs.                           :
                                        :          CIVIL ACTION NO.  4:14-cv-01051-MEM
ELECTROLUX HOME PRODUCTS, INC. :
          and                           :
ELECTROLUX NORTH AMERICA                 :
                    Defendants          :

## ORDER

AND NOW, this _____ day of _____, 2016, upon consideration of

Plaintiffs David and Brenda Pastuszek's Motion *in Limine* to Preclude Portions of Dr. Gene

Salkind's Testimony, and any response thereto, it is hereby **ORDERED** and **DECREED** that

said Motion is **GRANTED**.

Dr. Gene Salkind is **PRECLUDED** from testifying on the following topics:

1) His opinion on Plaintiff David Pastuszek's credibility;

2) His opinion that Plaintiff David Psatuszek was embellishing or feigning his injuries; and

3) Plaintiff's prior unrelated injuries.

BY THE COURT,

_____
THE HONORABLE MALACHY E. MANNION

## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA
## CIVIL DIVISION

DAVID PASTUSZEK and :
BRENDA PASTUSZEK, h/w :  JURY TRIAL DEMANDED
       :
    Plaintiffs :
  vs.     :
       :  CIVIL ACTION NO.  4:14-cv-01051-MEM
ELECTROLUX HOME PRODUCTS, INC. :
  and     :
ELECTROLUX NORTH AMERICA :
    Defendants :

## PLAINTIFFS' MOTION IN LIMINE TO PRECLUDE
## PORTIONS OF DR. GENE SALKIND'S TESTIMONY

  Plaintiffs David and Brenda Pastuszek, by and through their counsel Galfand Berger,

LLP, hereby file this Motion *in Limine* to Preclude Portions of Dr. Gene Salkind's Testimony. In

support thereof, Plaintiff relies on the attached Memorandum of Law.

      Respectfully Submitted,

      GALFAND BERGER, LLP


      BY: _____*/s/ Richard M. Jurewicz*_____
        RICHARD M. JUREWICZ, ESQUIRE
        Attorney for Plaintiff
        I.D. No. 39436
        1835 Market Street, Suite 2710
        Philadelphia, Pa.  19103
        (215) 665-1600
        rjurewicz@galfandberger.com

**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**
**CIVIL DIVISION**

| | | |
|---|---|---|
| DAVID PASTUSZEK and | : | |
| BRENDA PASTUSZEK, h/w | : | JURY TRIAL DEMANDED |
| | : | |
| Plaintiffs | : | |
| vs. | : | |
| | : | CIVIL ACTION NO.  4:14-cv-01051-MEM |
| ELECTROLUX HOME PRODUCTS, INC. | : | |
| and | : | |
| ELECTROLUX NORTH AMERICA | : | |
| Defendants | : | |

**PLAINTIFFS' BRIEF (MEMORANDUM OF LAW)**
**IN SUPPORT OF THEIR MOTION IN LIMINE TO**
**PRECLUDE PORTIONS OF DR. GENE SALKIND'S TESTIMONY**

**I.     MATTER BEFORE THE COURT**

Before this Honorable Court is Plaintiffs David and Brenda Pastuszek's Motion *in Limine*

to Preclude Portions of Dr. Gene Salkind's Report regarding the doctor's inappropriate

credibility assessments of David Pastuszek, unsupported accusations of embellishment, and any

discussion of unrelated prior injuries. In his report, Dr. Salkind makes inappropriate and

improper comments on David Pastuszek's credibility, a topic that is solely within the province of

the jury. Dr. Salkind cannot be permitted to testify as to his opinion of David Pastuszek's

credibility and thereby encroach on the jury's role as evaluator of witness credibility.

His attacks on Plaintiff include accusing him of embellishing his injuries, although Dr.

Salkind never establishes a proper factual basis through recognized methods and procedures for

making such an opinion, as required by Federal Rule of Evidence 702 and Daubert v. Merrell

Dow Pharmaceuticals, Inc. In reading Dr. Salkind's report, it is quite clear that he is nothing

more than a mouthpiece for Defense counsel by expressing a theme designed to tarnish the

image of David Pastuszek.

1

Dr. Salkind also cannot be permitted to testify about unrelated prior injuries that have nothing to do with the incident that brings the parties before this Court. Such information is irrelevant and whatever probative value it has is outweighed by its prejudicial effect. The above proffered testimony of Dr. Salkind must be precluded for the reasons identified herein.

## II.   QUESTIONS PRESENTED

Should this Honorable Court preclude Dr. Salkind from offering opinions on David Pastuszek's credibility, which is a question that is solely a matter for the jury to determine?

Suggested Answer: YES.

Should this Honorable Court preclude Dr. Salkind from testifying concerning his baseless opinion that David Pastuszek is "embellishing" his injuries where Dr. Salkind did not perform adequate testing to make such a finding?

Suggested Answer: YES.

Should this Honorable Court preclude Dr. Salkind from testifying about unrelated previous injuries suffered by David Pastuszek that have no bearing on the present litigation where Dr. Salkind has made no causal connections between the prior injuries and Pastuszek's health issues that arose from the subject accident?

Suggested Answer: YES.

## III.   FACTS

This matter arises from an August 27, 2013 accident in which Plaintiff David Pastuszek, a local truck driver, was making his first stop of the day and unloading a truck that indisputably had been improperly and negligently loaded by Defendants in such a manner that a commercial washer fell and struck Plaintiff, causing him to fall to the ground. Plaintiff David Pastuszek, who was acting in the course and scope of his employment with J.B. Hunt Transport, Inc., had no role whatsoever in loading or securing the load in the trailer, as it was sealed when he received it to transport to various local retailers. The Electrolux Defendants were solely responsible for loading the appliances and equipment into the truck driven by Plaintiff. A representative of

2

Defendants admitted that the trailer was improperly loaded and secured. (Bzura Dep., excerpts attached as Exhibit A, at 77-79). Plaintiff's accident was investigated by his employer J.B. Hunt, which concluded that the accident was in no way Plaintiff's fault, but rather that the trailer had been loaded improperly by Defendant's employees. (Exhibit B). As a result of his accident, Plaintiff David Pastuszek suffered injuries to his lower back, including herniated discs in his lumbar spine and severe pain and suffering.

In the course of this litigation, Defendants had Plaintiff David Pastuszek examined by Dr. Gene Salkind for a Defense Medical Exam. Dr. Salkind produced a 10-page report on September 5, 2015. (Exhibit C). A second report from Dr. Salkind dated October 23, 2015 was subsequently produced. (Exhibit D). Dr. Salkind opined in these reports that Plaintiff suffered "at most...a lumbar sprain and strain" as a result of his August 27, 2013 work accident (incorrectly discussed as an August 26, 2013 accident). (Ex. D). He attributed any ongoing problems that Plaintiff is suffering to "lumbar degenerative disc disease," with no further explanation. Defendants retained Dr. Salkind "for a neurosurgical independent medical examination on August 28, 2015." (Ex. C). Dr. Salkind examined and met with Plaintiff only once.

Despite being retained by Defendants for a neurosurgical medical examination, Dr. Salkind offered judgmental commentary on Plaintiff's credibility. Dr. Salkind scoffed at Plaintiff's credibility. (Ex. C at 6). Dr. Salkind also heavily implied that Plaintiff is a liar because Dr. Salkind's interpretation of a particular medical record differs from what Dr. Salkind understood Plaintiff to have told him. (Ex. C at 7). Dr. Salkind was critical of Plaintiff for not divulging an accident to Plaintiff's toe that occurred in 2009, despite the fact that no toe injury is alleged in the present litigation. (Ex. C at 7). Dr. Salkind did not convey exactly what questions about Plaintiff's history that Dr. Salkind asked Plaintiff or how he phrased them, which can

3

significantly impact how an individual responds. Dr. Salkind again implied that Plaintiff is a liar for not mentioning injuries Plaintiff suffered to his eye while working in 2012. (Ex. C at 7).

Dr. Salkind further accused Plaintiff of "symptom magnification and embellishment" and "feigned weakness." (Ex. C at 4). However, Dr. Salkind did not indicate that he conducted any symptom validity testing (*e.g.*, Waddell's signs) that could *possibly* empirically demonstrate such embellishment. Dr. Salkind reiterates his claims of embellishment based on portions of reports conducted by other doctors for which he was not present. (Ex. C at 9). No other doctor who has examined Pastuszek other than Dr. Salkind has expressed any opinion or made any note in Pastuszek's medical records that would indicate he is embellishing his injuries. Dr. Salkind does not address any other explanations for what he describes as "a disconnect" between the results of an exam a month before the defense medical examination and the results he found. (Ex. C at 9).

Dr. Salkind spent much of his report discussing prior injuries suffered by Plaintiff that have nothing to do with the injuries alleged to have been suffered in the August 27, 2013 accident. Dr. Salkind discussed Plaintiff's two myocardial infarctions (heart attacks), history of smoking, lens implants, and difficulty sleeping, none of which is relevant to Plaintiff's lower back, neck, and left hip injuries from his August 27, 2013 accident. Dr. Salkind also devotes a substantial portion of his opinion to rehashing injuries that Pastuszek suffered in 2009 to his right toe, in January 2011 to his neck and right shoulder, in January 2012 to his eye, in May 2012 to his neck/back and shoulders, and in June 2012 to his hip, right leg, right knee, and right ankle. Dr. Salkind mentions these accidents without explaining how, if at all, any of them are related to Plaintiff's injuries suffered in the subject accident. In fact, Dr. Salkind's only commentary on these prior injuries is that Pastuszek did not tell Dr. Salkind about these injuries.

4

Plaintiffs' Complaint very specifically identified injuries to David Pastuszek's lumbar spine (lower back), neck, and left hip. The incidents involving injuries to body parts other than those are wholly irrelevant. Dr. Salkind offered no connection between any prior injuries to Plaintiff's lumbar spine, neck, and left hip and his present injuries to those body parts.

Dr. Salkind cannot be permitted to testify concerning these inadmissible topics. The anticipated efforts of Defendants to have Dr. Salkind opine on David Pastuszek's credibility, "embellishment," and unrelated injuries have compelled Plaintiffs to file this omnibus Motion *in Limine*.

## IV.  ARGUMENT

### A.  Dr. Salkind inappropriately offers opinions on Plaintiff's credibility and by doing so goes beyond what is permissible for an expert to discuss.

Despite ostensibly being a report of a defense medical exam, Dr. Salkind offers opinions on the credibility of Plaintiff David Pastuszek in a manner that is inadmissible as it encroaches on the jury's job as fact finders. "The credibility of witnesses is generally **not an appropriate subject for expert testimony**." Coney v. NPR, Inc., 312 Fed. Appx. 469, 474 (3d Cir. 2009) (quoting United States v. Adams, 271 F.3d 1236, 1245 (10th Cir. 2001)). "Absent unusual circumstances, **expert medical testimony concerning the truthfulness or credibility of a witness is inadmissible**...because it invades the jury's province to make credibility determinations." Id. (quoting United States v. Beasley, 72 F.3d 1518, 1528 (11th Cir. 1996)). "A **doctor...cannot pass judgment on the alleged victim's truthfulness in the guise of a medical opinion, because it is the jury's function to decide credibility**." Id. (quoting United States v. Whitted, 11 F.3d 782, 785-86 (8th Cir. 1993)). Nevertheless, passing judgment on Pastuszek's credibility is exactly what Dr. Salkind did numerous times in his report.

Throughout what is supposed to be a medical expert report, Dr. Salkind offers commentary on Pastuszek's credibility. On page 6 of his report, Dr. Salkind writes that his perception of an X-ray from 2007 seems to somehow "run[] counter to what the patient told me, and brings his credibility into question." (Ex. C). Directly criticizing Plaintiff's credibility is far beyond the scope of a medical expert and inappropriately delves into an area reserved for the jury. Dr. Salkind goes even further and accuses Plaintiff of lying about prior work-related injuries. Id. at 7 ("Again, this discusses a work-related injury, which the patient specifically denied to me," a comment made in regard to an eye injury). As it is unclear how Dr. Salkind phrased his questions to Plaintiff or whether there may have been a miscommunication, it is inappropriate for Dr. Salkind to assume that Plaintiff intentionally hid information. These sorts of comments and opinions from Dr. Salkind are outside the scope of his expertise and are not the type of testimony that a medical expert is permitted to offer.

By making these inappropriate quips on Pastuszek's credibility, Dr. Salkind is interfering with what is solely within the jury's discretion. See United States v. Jannotti, 673 F.2d 578, 598 (3d Cir. 1982). Whether Pastuszek is telling the truth about his injuries and the events that led to those injuries is solely for the jury to decide. Dr. Salkind cannot be allowed to co-opt that role and unfairly influence the jury's decision with the perceived added weight that comes with supposed expert testimony.

## B. Dr. Salkind's opinion that Plaintiff was embellishing his injuries is unsupported by methods and procedures of science.

Dr. Salkind, as a proffered medical expert, cannot offer an opinion that Plaintiff is exaggerating or embellishing his injuries unless he supports that opinion with methods and procedures of science, which he did not. An expert's testimony must conform to the

6

requirements of Rule 702 of the Federal Rules of Evidence in order to be admissible. Rule 702

states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a)     the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)     the testimony is based on sufficient facts or data;
>
> (c)     the testimony is the product of reliable principles and methods; and
>
> (d)     the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702.

The Third Circuit has stated "Rule 702 has three major requirements: (1) the proffered

witness must be an expert, i.e., must be qualified; (2) the expert must testify about matters

requiring scientific, technical or specialized knowledge; and (3) the expert's testimony must

assist the trier of fact." Pineda v. Ford Motor Co., 520 F.3d 237, 244 (3d Cir. 2008). The second

prong requires the expert's testimony to be reliable by a preponderance of the evidence and

supported by "methods and procedures of science" rather than on "subjective belief or

unsupported speculation." In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 744 (3d Cir. 1994)

(quoting Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993)), cert denied 513

U.S. 1190 (1995) ("Paoli II"). The party offering an expert must demonstrate that the expert's

conclusions are reliable by a preponderance of the evidence. Paoli II, 35 F.3d at 744.

The trial court "must examine the expert's conclusions in order to determine whether

they could reliably flow from the facts known to the expert and the methodology used." Heller v.

Shaw Industries, Inc., 167 F. 3d 146, 153 (3d Cir. 1999). An expert's testimony must rest on a

reliable foundation of methodology and physical evidence and be relevant to the particular facts

of the case. Daubert, 509 U.S. at 597. There cannot be too great of a gap between the physical

evidence and the opinion proffered. General Electric Co. v. Joiner, 522 U.S. 136, 146 (1997). To

be reliable, an expert's opinion must be based on scientific methods and procedures, not merely

on "**subjective belief or unsupported speculation.**" Daubert, 509 U.S. at 590. "[N]othing in

Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that

is connected to existing data only by the *ipse dixit* of the expert." General Electric Co., 522 U.S.

at 146.

  In the present matter, Dr. Salkind has made great leaps in rendering his unsupported

opinion that Pastuszek was embellishing his injuries. Dr. Salkind did not administer any of the

symptom validity tests that are often used in medical examinations. Rather, Dr. Salkind's

opinions on Pastuszek's purported malingering are merely *ipse dixit*. Dr. Salkind claims that tests

administered over a month prior to the defense medical examination showed better results than

what Pastuszek demonstrated at that exam. (Ex. C at 9). However, not only was Dr. Salkind not

present at the prior test, he does not explain why other causes for the supposed discrepancy are

any less likely than malingering. Rather, Dr. Salkind jumps directly to the conclusion that

supports Defendants' narrative and fails to elaborate. He does so without even conducting his

own symptom validity test, which would be quite common, especially once Dr. Salkind became

suspicious that Pastuszek was not being earnest in his effort. Such tests are designed in an effort

to identify non-organic components to pain and take many forms, including distraction tests.

  To the extent any physician can identify whether an individual is "feigning" or

"embellishing" symptoms, such a finding must be made by conducting actual recognized tests.[1]

---

[1] In a Congressional Response Report, the Office of the Inspector General noted that the reliability of symptom
validity tests is questionable, but acknowledged that the medical community does recognize certain tests. "Although
SVTs [symptom validity tests] are commonly referred to as malingering tests, malingering **is just one possible
cause of invalid performance**. Office of Inspector General, *The Social Security Administration's Policy on*

Dr. Salkind did not do this, but rather relied solely on his own belief, which is not proper under the standard articulated by Daubert, as described above. Subjective belief and unsupported speculation are insufficient where the proffered expert does not conduct his own testing. See Daubert, 509 U.S. at 590. At best, Dr. Salkind makes a tenuous connection between two separate examinations a month apart. From that, he draws an unwarranted conclusion that the only cause of different flexion numbers is that Plaintiff is intentionally exaggerating his injuries. From such a minimal amount of information and no testing designed to detect symptom magnification, Dr. Salkind is unable to render an opinion supported by facts that Plaintiff is "feigning" or "embellishing." At most, Dr. Salkind can testify to the facts of the test conducted by Plaintiff's treating physician and the results of his examination, but he is not equipped to render an opinion that the reason for the perceived discrepancy is that Plaintiff was embellishing his injuries.

### C. Prior incidents of injuries unrelated to Plaintiff's lower back and left hip are irrelevant, so Dr. Salkind must be precluded from discussing those injuries.

Plaintiffs have alleged that David Pastuszek injured his lower back, neck, and left hip as a result of a commercial oven negligently stacked by Defendants falling on him. In Dr. Salkind's report, he goes through exhaustive steps to detail several other unrelated accidents and injuries from David Pastuszek's past that have nothing to do with his lower back. For evidence to be admissible, it must be relevant. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." F.R.E. 401. Evidence that is not relevant is not admissible. F.R.E. 402. Evidence of prior injuries unrelated to the body part(s) injured in the

---

*Symptom Validity Tests in Determining Disability Claims*, A-0813-23094, at Appx. C-1 (Sept. 2013). **Even those tests—which are far more accurate than the *ipse dixit* of Dr. Salkind—cannot identify that the reason for discrepancies in a patient's abilities is necessarily malingering.** Id. at 3. Rather, Dr. Salkind makes this leap only because it suits the narrative advanced by Defendant. In reality, Dr. Salkind cannot render the opinion that Pastuszek is intentionally exaggerating his symptoms. Such a claim would be questionable with proper testing, and is wholly inadmissible without utilizing recognized procedures for symptom validity testing.

present accident is entirely irrelevant. Bair v. Velasco, 2015 U.S. Dist. LEXIS 46582, *3-6 (M.D.Pa. April 9, 2015). Even where evidence is relevant, it must be precluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. F.R.E. 403.

In Bair, the Middle District precluded the defendant from introducing evidence of a plaintiff's prior injuries to his lumbar spine in an auto accident just over a year before a work-related accident that was the subject of the matter before the Court. There, the plaintiff alleged injuries to his neck, upper back, head, and both knees. Id. Conspicuously absent was any mention of the lower back or lumbar spine. Therefore the Middle District precluded the prior injuries to unrelated body parts as irrelevant. Id.

Dr. Salkind's report goes far beyond discussing prior injuries to those body parts injured in the subject accident. The May 2009 injury to Plaintiff's right toe and the January 2012 injury to Plaintiff's eye are totally irrelevant to the present litigation. These injuries and the accidents that caused these injuries are completely void of any value that would have the tendency to make the existence of any fact of consequence any more or less probable. See F.R.E. 401. As these accidents and injuries are irrelevant, they are inadmissible. F.R.E. 402.

Plaintiff would have no objection to evidence of prior injuries specifically to Plaintiff's lower back being and neck being admitted if the purpose of discussing those injuries was in connection to Plaintiff's present condition. However, it is clear from Dr. Salkind's report that he does not discuss these prior injuries as potential contributing causes for his present condition, but rather as further efforts to attack Pastuszek's credibility for not divulging some of these accidents. Prior injuries are only relevant if they somehow impact the plaintiff's current condition. See Bair, supra at *6 (injuries must be "sufficiently similar to those suffered" in the

incident accident). Dr. Salkind opines that Pastuszek's ongoing medical problems are the result of "lumbar degenerative disc disease"—not any prior accident to his neck or lower back.

Because Dr. Salkind has not connected those prior injuries to Pastuszek's current accident other than in inappropriate attacks on his credibility (see above), he must be precluded from discussing those accidents as well. As Dr. Salkind did not make a causal connection between those accidents and Pastuszek's present injuries, those prior injuries remain irrelevant and must be precluded under Rules 401 and 403. See Celmer v. Marriot Corp., 2004 U.S. Dist. LEXIS 17493, at *4 n.3 (E.D. Pa. Aug. 23, 2004) (granting the plaintiff's motion *in limine* to preclude past injuries where defendant's medical expert **"does not discuss a connection between these past injuries and Plaintiff's present health issues"**). If Dr. Salkind did try to make such a connection at trial, it would be outside the scope of his report. Allowing Defendants to introduce evidence of these prior injuries would be unduly prejudicial to Plaintiffs under Rule 403, as Dr. Salkind and Defendants have offered no connection of any of the prior injuries to the injuries suffered by David Pastuszek in the present litigation. Without such a connection, the prior injuries are lacking any relevance or, to the extent there is any relevance, that relevance is outweighed by the prejudicial effect that would result in the jury being misled and/or misled.

## V.    RELIEF REQUESTED

For the reasons set forth at length above, Plaintiffs respectfully request that this Honorable Court preclude Dr. Gene Salkind from offering testimony concerning his assessment of David Pastuszek's credibility and any testimony concerning unrelated prior injuries.

Respectfully Submitted,

GALFAND BERGER, LLP

BY: _____ /s/ *Richard M. Jurewicz* _____
         RICHARD M. JUREWICZ, ESQUIRE
         Attorney for Plaintiffs
         I.D. No. 39436
         1835 Market Street, Suite 2710
         Philadelphia, Pa.  19103
         (215) 665-1600
         rjurewicz@galfandberger.com

**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**
**CIVIL DIVISION**

| | | |
|---|---|---|
| DAVID PASTUSZEK and | : | |
| BRENDA PASTUSZEK, h/w | : | JURY TRIAL DEMANDED |
| | : | |
| Plaintiffs | : | |
| vs. | : | |
| | : | CIVIL ACTION NO.  4:14-cv-01051-MEM |
| ELECTROLUX HOME PRODUCTS, INC. | : | |
| and | : | |
| ELECTROLUX NORTH AMERICA | : | |
| Defendants | : | |

## CERTIFICATE OF NONCONCURRENCE

I, Richard M. Jurewicz, Esquire, certify that I requested counsel for Defendants'

concurrence in Plaintiffs David and Brenda Pastuszek's Motion *in Limine* to Preclude Portions of

Dr. Gene Salkind's Testimony pursuant to LR 7.1 and the parties could not agree.

GALFAND BERGER, LLP


BY:  _____ /s/ *Richard M. Jurewicz* _____
RICHARD M. JUREWICZ, ESQUIRE
Attorney for Plaintiff
I.D. No. 39436
1835 Market Street, Suite 2710
Philadelphia, Pa.  19103
(215) 665-1600
rjurewicz@galfandberger.com

# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA
### CIVIL DIVISION

DAVID PASTUSZEK and               :
BRENDA PASTUSZEK, h/w             :          JURY TRIAL DEMANDED
                                  :
                Plaintiffs        :
        vs.                       :
                                  :          CIVIL ACTION NO.  4:14-cv-01051-MEM
ELECTROLUX HOME PRODUCTS, INC. :
        and                       :
ELECTROLUX NORTH AMERICA          :
                Defendants        :

## CERTIFICATE OF SERVICE

I, Richard M. Jurewicz, Esquire, hereby certify that a true and correct copy of Plaintiffs

David and Brenda Pastuszek's Motion *in Limine* to Preclude Portions of Dr. Gene Salkind's

Testimony was sent to counsel below via email:

Frederick W. Bode, III, Esquire
Bryon R. Kaster, Esquire
Christine L. Line
DICKIE, McCAMEY & CHILCOTE, P.C.
425 North 21st Street, Suite 302
Camp Hill, Pa.  17011-2223
*Attorneys for Defendants, Electrolux Home Products, Inc. and Electrolux North America*
fbode@dmclaw.com
bkaster@dmclaw.com
cline@dmclaw.com

                                            GALFAND BERGER, LLP


                              BY:        /s/ *Richard M. Jurewicz*
                                          RICHARD M. JUREWICZ, ESQUIRE
                                          Attorney for Plaintiffs
                                          1835 Market Street, Suite 2710
                                          Philadelphia, Pa.  19103
                                          (215) 665-1600
                                          I.D. No. 39436
                                          rjurewicz@galfandberger.com

# EXHIBIT "A"

**Page 1**

1       IN THE UNITED STATES DISTRICT COURT
2       FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
3    --------------------------x
     DAVID PASTUSZEK & BRENDA   :  NO. 4:14-CV-01051-MEM
4    PASTUSZEK, h/w,            :
             Plaintiff(s),     :
5                              :
                               :
         v.                    :
6                              :
     ELECTROLUX HOME PRODUCTS,  :
7    INC., et al.,             :
             Defendant(s).     :
8    --------------------------x
9                - - -
              May 28, 2015
10               - - -
11       Oral deposition of MARTIN C. BZURA, held
12   at the law offices of Michael J. O'Connor, 608
13   W. Oak Street, Frackville, Pa., 17921, beginning
14   at 11:50 a.m., on the above date, before Denise
15   D. Bach, a Registered Professional Reporter and
16   Notary Public.
17
18
19
         ESQUIRE DEPOSITION SOLUTIONS
20            1835 Market Street
                Suite 2600
21      Philadelphia, Pennsylvania 19103
              (215) 988-9191
22
23
24

**Page 2**

1    APPEARANCES:
2
         GALFAND BERGER, LLP
3        BY: RICHARD M. JUREWICZ, ESQUIRE
         Suite 2710
4        1835 Market Street
         Philadelphia, PA 19103
5        215.665.1600
         rjurewicz@galfandberger.com
6        --Representing the Plaintiff(s)
7
8        DICKIE McCAMEY & CHILCOTE, P.C.
         BY: CHRISTINE L. LINE, ESQUIRE
9        Plaza 21, Suite 302
         425 North 21st Street
10       Camp Hill, PA 17011
         717.731.4800
11       cline@dmclaw.com
         --Representing the Defendant(s)
12
13
14
15
16
17
18
19
20
21
22
23
24

**Page 3**

1                I  N  D  E  X
2    WITNESS                              PAGE
     MARTIN C. BZURA
3    By Mr. Jurewicz                        5
     BY Ms. Line                           81
4
5            E  X  H  I  B  I  T  S
6    MARKED        DESCRIPTION           PAGE
7         (No Exhibits Were Marked.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

**Page 4**

1            DEPOSITION SUPPORT INDEX
2
3     DIRECTION TO WITNESS NOT TO ANSWER
4    Page  Line     Page  Line      Page  Line
5      (None)
6
7
8     REQUEST FOR PRODUCTION OF DOCUMENTS
9    Page  Line     Page  Line      Page  Line
10     (None)
11
12
13              STIPULATIONS
14   Page  Line     Page  Line      Page  Line
15     5     2
16
17
18            QUESTIONS MARKED
19   Page  Line     Page  Line      Page  Line
20     (None)
21
22
23
24


ESQUIRE
SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Page 77

1  Mr. Pastuszek was delivering for his drop-offs
2  had been improperly loaded?
3    A.    No.
4    Q.    Did Vince Messina ever tell you
5  that the trailer was improperly loaded, the one
6  that was involved in Mr. Pastuszek's accident?
7    A.    Yeah.
8    Q.    When did he tell you that?
9    A.    I can't remember exactly when.
10   Q.    What did he tell you?
11   A.    That it was improperly loaded and
12  Dave got hurt.
13   Q.    Did he tell you how it was
14  improperly loaded?
15   A.    No; because I will have to step in
16  here in just a minute.  It was later that day
17  that that trailer did get returned.  Okay.  And
18  they called the ops clerk.  The ops clerk told
19  me and then Dave Bayer came out, we went over,
20  opened the door, looked at it.  At that point,
21  there was stuff laying all over the floor that
22  wasn't secured.  But I can't say that didn't
23  happen in transit bringing it back, we just saw
24  there was, you know, stuff left.

Page 78

1          That trailer had to get offloaded,
2  but, like I said, that was late afternoon, that
3  was maybe like 2 o'clock and we were going at
4  2:30.  But I had seen the trailer that got
5  returned, and the load, it was laying all over
6  the place, but it wasn't secure.  And I want to
7  say, if I was a guessing man, it was like
8  halfway unloaded.
9          MS. LINE:  Objection.
10         THE WITNESS:  And that's all I
11  seen.
12         MS. LINE:  Can we establish that
13  he is only to answer a question if he knows the
14  answer and not to give a speculative or a
15  guessing answer?
16         MR. JUREWICZ:  If you want to
17  clean that up with him.  I'm perfectly happy
18  with what he has to say.
19      I think all objections except as
20  to the form of the question are reserved.
21  BY MR. JUREWICZ:
22   Q.    What did Vince tell you, Messina
23  that is, as to why in his belief he thought the
24  trailer that was loaded for Dave Pastuszek to

Page 79

1  deliver had been improperly loaded?
2    A.    Because something fell on Dave.
3    Q.    And is something ordinarily not
4  supposed to fall if a trailer is loaded
5  properly?
6    A.    Correct.
7    Q.    And the reason for that is either
8  the load's going to be secured by blocking or
9  it's going to be shrink wrapped if it's a
10  multi-load --
11   A.    Stop.
12   Q.    -- or dunnage, something to
13  prevent the second, third and load closest to
14  the bulkhead to shift or move, right?
15   A.    Correct.
16   Q.    When you opened up -- when you saw
17  the trailer that was brought back, did you see
18  any shrink wrapping that was laying around?
19   A.    No.
20   Q.    All right.  Did you see anything
21  in the trailer that would indicate that that
22  second load from the bulkhead had been shrunk
23  wrapped?
24   A.    No, I can't say I did.

Page 80

1    Q.    Did you see any dunnage in there
2  that would indicate that there was -- that that
3  load had been secured?
4    A.    No.
5    Q.    Did you see any, you know -- do
6  you know what brace poles are?
7    A.    Yes.
8    Q.    Did you see any brace poles
9  securing the load?
10   A.    No.
11   Q.    In the past when your men have
12  loaded trailers, have they used dunnage between,
13  let's say, a first load and second load or
14  second load and third load?
15   A.    If need be.
16   Q.    And have they used shrink wrap
17  between the first load and second load or third
18  load and fourth load?
19   A.    Yes, they did.
20   Q.    And have they used jam poles or
21  braces between the first load, second load or
22  second load and third load, if needed?
23   A.    Yes, they did.
24   Q.    And the decision to use dunnage,



# EXHIBIT "B"

## Injury Investigation Report

| | | | |
|---|---|---|---|
| Alpha Code: PASD5 | Board Code: 3S@ | Name: DAVID PASTUSZEK | |
| Hire Date: 11/01/2010 | City: | State: | |

| | | | |
|---|---|---|---|
| Team Leader/OM: | Mike Forrest/Corporate/JBHunt | Safety Manager/ ARM: | Shawn Would |
| Fleet/Project Manager: | Rich Hostetler | EventNumber: | 873641 |
| Truck Director/VP: | Bryan Schwenk/Corporate/JBHunt | Project: | |

| | | | |
|---|---|---|---|
| Date of Injury: | 27 AUG 2013 | Date Reported: | 27 AUG 2013 |
| Type of Injury (ie Lumbar Strain, Laceration): | DRIVER HAS SEVERE PAIN IN HIS BACK, RIBS, AND HEAD | | |
| Body part affected: | BACK, RIBS, AND HEAD | | |
| Initial Treatment: | Doctors Appointment | | |
| How did injury occur? | DRIVER WAS UNLOADING APPLIANCES FOR 1ST STOP WHEN DRIVER WENT TO GRAB LAST PIECE A WASHING MACHING AND 2 GAS RANGES FELL ON THE DRIVER | | |
| What caused injury (i.e., Slippery surface, faulty equipment, etc.) | ATER TALKING WITH DRIVER AND WAREHOUSE SUPERVISOR AT RDC THIS WAS A DIRECT RESULT OF IMPROPER LOADING BY SHIPPER. THERE IS NO WAY TO KNOW WHEN A BOX IS GOING TO COLLAPSE FROM WEIGHT AND FALL ON DRIVER! THIS CAN HAPPEN AT ANY TIME WITH NO WARNING!! | | |
| Activity at time of Injury? | UNLOADING | | |
| Factors that contributed to the incident: | IMPROPER LOADING BY SHIPPER AS BOX HAD CRUSH DAMAGE THAT IN TURN LED LED TO APPLIANCES FALLING ON DRIVER AFTER HE MOVED REFRIGERATOR WHICH WAS HOLD THEM UP FROM FALLING | | |
| Witness Name: | N/A | | |
| Account of Incident: | N/A | | |
| Witness Name: | N/A | | |
| Account of Incident: | N/A | | |
| Was proper equipment used for task? | ● Yes ○ No | | |
| Explain | | | |
| Was personal protective equipment used? | ● Yes ○ No | | |
| Explain | | | |
| Were appropriate safeguards in place? | ● Yes ○ No | | |
| Explain | | | |
| Is there a JSA for the activity/task that was performed? | ● Yes ○ No | | |
| Explain | | | |
| Were JSA steps being followed at the time of the injury? | ● Yes ○ No | | |
| Explain | | | |
| Had the employee been trained on the JSA and is it documented. | ● Yes ○ No | | |
| Explain | | | |
| Corrective Actions JSA Training? | ○ Yes ● No | | |
| Prevention Plan | NOTHING DRIVER COULD HAVE DONE DIFFERENTLY BECAUSE NOTHING WAS LEANING FORWARD OR OBVIOUSLY SHOWING IT WOULD FALL HAD HE REMOVED REFRIGERATOR | | |

| Signature | Date |
|---|---|
| Supervisor | |

PASDG David Pastuszek    5 Sep 13

# EXHIBIT "C"

## LEONARD A. BRUNO, MD / GENE Z. SALKIND, MD P.C.

### NEUROLOGICAL SURGERY

727 WELSH ROAD                                         (215) 914-2320
SUITE 108                                              (215) 914-2365 FAX
HUNTINGDON VALLEY, PA  19006

                                                      09/05/2015

Christine L. Line, Esquire
Dickie, McCamey, and Chilcote, PC.
Attorneys at Law
Plaza 21, Suite 302
425 North 21st Street
Camp Hill, Pennsylvania 17011-2223

Re: Pastuszek v. Eletrolux Home Products, Inc., et. al.
Our File No.: 0024303.0348277

Dear Ms. Line:

I evaluated David Pastuszek in my office for a neurosurgical
independent medical examination on August 28, 2015.  The patient is a
53-year-old, left-handed male, who was employed as a truck driver for
J. B. Hunt, Inc.  The patient tells me that in 1994, that he sustained
an L4-L5 disc herniation as a result of a work-related injury.  The
patient underwent an L4-L5 discectomy performed by Dr. Rajjoub and had
a good postoperative convalescence.  He returned to work in
approximately 6-8 weeks.

While employed by J.B. Hunt, Inc, on August 26, 2013, Mr. Pastuszek
was unloading a truck.  "As I turned around in the truck to place
something on to the dock, a washer, refrigerator, and stove fell on
me."  The patient tells me that he was struck on the left neck,
shoulder, and left side of his low back.  The patient denied any loss
of consciousness nor head trauma.  Immediately, "when I took a deep
breath it would hurt.  I thought I broke a rib."  The patient reported
the incident to his supervisor and it was suggested that he go home
and see how he felt in the morning.  He received no medical treatment
on the day of the incident.

The following day, the patient awakened complaining of pain in his
entire left side and he was black and blue.  He was sent to Work
Health on August 27, 2013.  He was examined and x-rays were taken, and
the patient was diagnosed with "spasms and contusion."  He was placed
out of work for 3 months and ultimately returned to work at light
duty.  He attended physical therapy 3 times weekly, which he claims
afforded him some benefit.  He started physical therapy shortly after
the work-related incident.

RE:  PASTUSZEK, DAVID
Page 2

The patient worked at light duty in November 2013 through April 2014.
He reported left leg numbness that radiated to his toes and ultimately
a lumbar MRI was obtained on December 4, 2013.  It was recommended
that the patient undergo chiropractic treatment with massage therapy
which afforded him only transient relief.

The patient was ultimately referred to Bruce H. Levin, MD at the
Pennsylvania Spine and Headache Center.  Dr. Levin performed L4-L5 and
L5-S1 transforaminal epidural steroid injections on December 17, 2013
and February 6, 2014.  The lumbar injections initially gave the
patient good relief, but as his pain persisted, Dr. Levin performed a
lumbar discogram/CT scan from L2-L3 through L5-S1 on April 29, 2014.
The patient then underwent 2 further lumbar injections with only
temporary relief.

The patient underwent a consultation with James McInerney, MD, a
neurosurgeon at the Hershey Medical Center.  On June 18, 2014, the
patient underwent an L5-S1 microdiscectomy.  He had an initial good
postoperative course, but then began to have intermittent fevers,
increased pain, and purulent wound drainage.

Consequently, the patient presented to the Geisinger Medical Center on
July 3, 2014.  The patient was evaluated by Shelly Diane Timmons, MD,
a neurosurgeon.  She found that the patient had grossly purulent
brownish-tan drainage that was easily expressed from the wounds.  It
was painful and was under pressure and a large volume had been
expressed from the wound.  Mr. Pastuszek stated that his left leg pain
resolved with the surgery, but that he had some typical residual
intermittent numbness.  It was Dr. Timmons assessment that the patient
had a deep space surgical wound infection and she took the patient to
the operating room emergently for an incision and drainage, as well as
wound cultures.  The cultures were significant for methicillin-
sensitive Staphylococcus aureus, and the presumption was that the
patient would be given intravenous antibiotics for at least 2 weeks.
The patient was started on vancomycin and cefepime intraoperatively.
The Infectious Disease consultants converted Mr. Pastuszek to Keflex
by mouth, and the patient was discharged to home on July 5, 2014.
When Dr. Timmons evaluated the patient on July 8, 2014, she felt that
he had an excellent result with respect to resolution of his radicular
pain and early wound healing. CRP had decreased from 75 to 14, and
erythrocyte sedimentation rate was approximately 42.  The patient's
white blood cell count decreased from 19.10 to 11.8.

Postoperatively, the patient did more physical therapy, but began to
experience difficulty with bowel and bladder function.  A repeat
lumbar MRI was performed, and the patient claimed that "something was
pinching a nerve."  According to Dr. Timmons, the patient had the
picture of an acute L4 and L5 radiculopathy congruent with

RE: PASTUSZEK, DAVID
Page 3

degenerative disk, probable small HNP, and foraminal stenosis at L4-L5. He also had a new right L3-L4 disc protrusion, but this was felt to be asymptomatic. Dr. Timmons planned for a left L4-L5 decompression, foraminotomy, and possible microdiscectomy on April 9, 2015. The patient had a good postoperative recovery with improved bowel and bladder function. He had started a program of physical therapy 3 times weekly which continues to the present time.

As of the present time, the patient's chief complaint is that of left-sided low back pain, hip pain, and left lateral calf pain. He tells me that he feels about the same as he did before surgery. The patient admits to spasms about his left lateral thigh. He tells me that his pain is constant, but that it varies in intensity. He describes it as annoying, and tells me that his complex is 50% left-sided low back pain and 50% left hip pain. The patient rates his pain as a 6-7 on a scale of 0-10. He claims that his low back pain is increased with walking less than 0.5 mile. His pain is improved with medication, hot compresses, and a TENS unit. The patient feels that his pain complex has affected his activities of daily living. He cannot take care of his horses, cannot fish, and he cannot drive a truck any longer. He has been out of work since approximately April 2014.

The patient admits to numbness of the left great toe, as well as the arch and ball of the left foot. He denies weakness nor bowel or bladder dysfunction.

The patient specifically denied any prior or subsequent traumas. He tells me that in 1994, he sustained a work-related injury. He saw the company physician and was diagnosed with a lumbar disc herniation. As previously stated, he underwent an L4-L5 discectomy and returned to work full time, full duty.

Past medical history is significant for 2 myocardial infarctions in 1997 and in 2009. The patient has undergone angioplasty without stent placement, multiple lumbar surgeries as previously detailed, an appendectomy, and cataract surgery with lens implants. He has no known drug allergies. The patient takes gabapentin t.i.d., tizanidine t.i.d., cyclobenzaprine p.r.n., and tramadol 2-3 times per day. He took all of his medicines at 9:45 a.m., and I interviewed him at approximately 1:50 p.m.

Social history is significant for one-half pack per day tobacco ingestion intermittently for 35 years. The patient drinks alcohol rarely. He does not use recreational or intravenous drugs.

Family history is noncontributory.

RE: PASTUSZEK, DAVID
Page 4

Review of systems is significant for lens implants and difficulty
sleeping.

On physical examination, I found the patient to be awake, alert, and
in no acute distress. He exemplified significant signs of symptom
magnification and embellishment. Examination of the patient's low
back revealed a well-healed lumbar laminectomy wound in the midline
spanning L4 through S1. There was no erythema, subcutaneous
collection, nor tenderness. There was no spinous process,
paravertebral, nor sciatic notch tenderness. There was no
paravertebral spasm. Straight leg raising was negative to 90 degrees
bilaterally. Despite this, forward flexion was accomplished to only
40 degrees with complaints of low back pain. Motor examination
revealed normal tone and bulk. Despite this, there was diffuse give-
way weakness in the muscle groups tested in the entire left leg. This
included the iliopsoas, quadriceps, hamstring, tibialis anterior,
extensor hallucis longus, and the gastrocnemius soleus complex.
Strength was 5/5 in the same muscle groups on the right. Sensation
was intact to light touch and pinprick. Deep tendon reflexes were +2
and equal at the knees and ankles. The patient's gait was steady and
non-antalgic. Despite this, heel and toe walking was difficult
secondary to feigned weakness in the left leg.

I was able to review the following documents pertinent to the care of
David Pastuszek:

1. The complaint;
2. The deposition transcript of David Pastuszek, dated December 22,
2014;
3. The deposition transcript of Brenda Pastuszek, David's wife, dated
December 22, 2014;
4. The plaintiff's responses to interrogatories;
5. Plaintiff's rule 26 initial disclosures-including Workmen's
Compensation for prior/current claims;
6. The plaintiff's responses to request for production of documents;
7. Medical records from the Sunbury Community Hospital;
8. Records from the Shamokin Dam Health Center;
9. Medical records from Pagana and Pagana-DeFazio Family Practice,
LLC;
10. Medical records from the Evangelical Community Hospital;
11. Records from the Schuylkill Medical Center;
12. Medical records from Sun Orthopedics;
13. Medical records from Phoenix Rehab;
14. Medical records of Bruce H. Levin, MD, the Pennsylvania Spine and
Headache Center;
15. Records from Milton S. Hershey Medical Center, James McInerney,
MD;
16. Records from the Geisinger Medical Center.

RE:  PASTUSZEK, DAVID
Page 5


I was personally able to review the following diagnostic studies
pertinent to the care of David Pastuszek:

1. An x-ray of the lumbar spine dated August 28, 2013.  There was
evidence of a lumbarized sacrum.  There was also evidence of disc
space narrowing at L4-L5 with evidence of endplate sclerosis and
osteophytic disease.  There appeared to be evidence of prior surgical
intervention at the L4-L5 level;
2. An MRI of the lumbar spine both with and without gadolinium dated
September 16, 2013.  To my reading, there was evidence of diffuse
degenerative disc disease.  In the body of L2, there appeared to be a
hemangioma.  At L2-L3, there was evidence of disc desiccation with a
bulging annulus.  This gave rise to mild central spinal stenosis with
mild neural foraminal stenosis.  At L3-L4, there was evidence of disc
desiccation with a central and right-sided bulging annulus/disc
protrusion.  There was mild-to-moderate central spinal stenosis with
moderate left and moderate right neural foraminal stenosis.  At L4-L5,
there was evidence of prior surgical intervention on the left with a
bulging annulus and a left-sided disc protrusion.  There was
associated hypertrophy of the facet joints, with severe bilateral
neural foraminal stenosis.  At L5-S1, there was evidence of a bulging
annulus and an annular tear.  There appeared to be encroachment on the
left lateral recess secondary to scar tissue, and the disc protrusion.
There was severe left greater than right neural foraminal stenosis.
There was clearly evidence of bulging annuli and disc protrusions, as
well as epidural scar tissue from the prior surgery, but there was
clearly no evidence of an acute herniated nucleus pulposus;
3. A CT scan of the lumbar spine dated October 1, 2013.  There was
evidence of diffuse degenerative disc disease without any acute
fracture or spondylolisthesis.  There was both central as well as
neural foraminal stenosis, without an appreciable difference compared
to the prior lumbar MRI;
4. An MRI of the lumbar spine both with and without contrast dated
April 3, 2014.  There is again evidence of diffuse degenerative disc
disease as evidenced by diffuse disc desiccation.  There is a
persistent incidental hemangioma in the body of L2.  There is
persistent scar tissue identified at L4-L5 with a protruding disc and
significant bilateral foraminal narrowing secondary to a
disc/osteophyte complex.  At L5-S1, there is a bulging annulus with a
disc/osteophyte complex that is mildly effacing the L5 nerve root.
There is no change compared to the prior MRI and CT scan.  Of
interest, the radiologist who interpreted the film, Charles Austin,
MD, did not have the luxury of reviewing the prior lumbar studies;
5. An MRI of the thoracic spine dated December 4, 2013.  To my
reading, this was a normal study;
6. An MRI of the lumbar spine without gadolinium dated December 4,
2013.  The findings revealed no acute disc herniation, but rather the

RE:  PASTUSZEK, DAVID
Page 6

persistent degenerative disc disease giving rise to varying degrees of
both central and lateral recess stenosis;
7. A CT scan of the lumbar spine dated April 29, 2014.  There was
evidence of decreased disc height at L4-L5.  There were bulging annuli
from L2-L3 through L5-S1, and there was no significant change compared
to the lumbar MRI performed December 4, 2013.  There was specifically
no evidence of an acute herniated nucleus pulposus;
8. An MRI of the lumbar spine dated July 30, 2014.  This revealed
stable findings at most levels, but there was now evidence of a left
L5-S1 hemilaminectomy.  There was postoperative epidural scar tissue
with mild-to-moderate narrowing of the thecal sac.  There was clearly
hypertrophy of the facet joints.  There was increased post gadolinium
signal in the soft tissues posterior to the spinal canal.  There did
not appear to be any significant abscess;
9. An MRI of the lumbar spine both with and without contrast dated
October 17, 2014.  There were postsurgical changes identified at L4-L5
and L5-S1.  There was epidural scar tissue more marked on the left at
L5-S1, that was encasing the left S1 nerve root.  There was moderate-
to-severe left L5-S1 foraminal narrowing with diffuse degenerative
changes; there was specifically no evidence of an acute herniated
nucleus pulposus;
10. Flexion and extension lumbar spine films dated October 28, 2014.
There was evidence of diffuse degenerative disc disease in the lumbar
spine.  There did not appear to be any movement in flexion or
extension.

There are certain points that bear enumeration from my review of the
records.  The patient specifically denied to me any prior or
subsequent traumas, other than the incident in 1994 at work.  A note
from the Sunbury Community Hospital dated, June 8, 2007, revealed that
Mr. Pastuszek complained of back pain when he fell off of a truck at
work.  He had a history of prior back pain and the impression was that
of low back pain and a lumbar contusion.  An x-ray of the lumbar spine
was taken at the Sunbury Community Hospital on that date, which
revealed osteoarthritic changes of the lower lumbar spine.  This
clearly runs counter to what the patient told me, and brings his
credibility into question.

From an entry at the Sunbury Community Hospital dated September 20,
2008, the patient complained of back pain which started 2 days ago at
work.  There was radiation to the leg, and the patient sought
consultation with a chiropractor on September 19, 2008.  The
impression was that of acute myofascial lumbar strain.

On September 26, 2008 at the Evangelical Community Hospital, the
patient was evaluated at Occupational Medicine.  He complained of low
back pain and gave a history of prior lumbar disc surgery by Dr.
Rajjoub in 1995.  The patient claimed that after the procedure, that

10-28-15;10:02AM;                                    ;            #  7/ 11

RE:   PASTUSZEK, DAVID
Page 7

he had no recurrence of his symptoms in either his back or his legs.
The patient was moving a range hood at a pharmacy, when Mr. Pastuszek
and a co-worker attempted to pick up the range hood to test its
weight.  A few days later, the patient had pain and cramping in his
low back.  He was seen by a chiropractor and was evaluated at the
Sunbury Community Hospital Emergency Room.  He continued to complain
of discomfort in his low back, but denied any pain in his legs.  He
was diagnosed with a lumbar strain.

In the Sunbury Community Hospital Emergency Room visit dated May 7,
2009, the patient complained of right great toe pain when he ran over his
great toe with a pallet jack at work.  Again, this discusses a work-
related injury, which the patient specifically denied to me.

From reviewing a note authored by Dr. Pagana on May 27, 2010, the
patient was a truck driver and did a lot of heavy lifting throughout
the day with the moving company that he worked for until this month.
He is changing jobs and will be delivering appliances to the
department stores which will also require lifting heavy
equipment/appliances.

In a note authored by Dr. Pagana at the Shamokin Area Community
Hospital, on January 10, 2011, Mr. Pastuszek fell on ice and
complained of neck and right shoulder pain.  He also had headache and
joint pains and was diagnosed with a shoulder sprain, cervical sprain,
and multiple contusions.  He had no evidence of an intracranial
injury.  On January 12, 2011, this was another Workmen's Compensation
injury.  At the Sunbury Community Hospital on January 12, 2011, the
patient discussed that he slipped on ice while walking back to the
truck on January 10, 2011, while employed by J.B. Hunt.  "I was
walking back to the truck and both feet went out from under me"
landing more on the right than the left.  He complained of neck/back
and right shoulder pain.  The patient was diagnosed with a right
shoulder and cervical spine sprain and was not considered disabled as
a result of the injury.  He was treated with physical therapy through
December 1, 2011.

On January 30, 2012, the patient presented to the Geisinger Medical
Center Emergency Room with complaints of eye pain.  A trailer strap
became loose and struck the patient in the eye.  Again, this is a
work-related injury that the patient never disclosed to me.

On May 3, 2012 from the Shamokin Dam Health Center physical therapy
note, the patient complained of neck/back and shoulders pain which was
identical to the pain when he injured himself in January 2011.  It was
felt that the symptoms were directly related to the workmen's
compensation injury of January 2011.

RE: PASTUSZEK, DAVID
Page 8

On June 22, 2012, while evaluated at the Schuylkill Medical Center,
Mr. Pastuszek stepped off a tractor trailer and his foot got caught in
the bracing. He fell backwards, and the patient has right leg got
twisted and the patient landed on his left hip. He complained of pain
to the left hip, right leg, right knee, and right ankle. He was
diagnosed with a right ankle sprain and left hip sprain. An x-ray of
the pelvis and left hip revealed mild degenerative changes of the hips
bilaterally without evidence of acute fracture of the pelvis or left
hip. This again became a Workmen's Compensation claim. In the notice
of compensation payable, dated July 5, 2012, the patient was injured
on June 22, 2012, and sustained an injury to his right ankle, right
knee, left hip, and lumbar spine. He fell as he was getting out of
the trailer and his right ankle got caught on the bumper. By July 24,
2012, on a Phoenix Rehab discharge summary, the patient had improved
low back pain levels and return to unrestricted work by his referring
provider. The fact that a mention is made that his low back pain
improved, runs counter to the history that the patient gave me, as he
clearly denied any issues with his back or leg after the lumbar
surgery, and prior to August 27, 2013 injury.

From my review of the Occupational Medicine Clinic visit dated August
28, 2013, it discusses the August 27, 2013, work-related injury. The
patient complained of pain after an appliance toppled on him. His
primary problem was in the thoracic region. He had moderate, constant
pain that he rated as a 7/10. His 2nd problem was pain in the lumbar
region that was moderate and intermittent, and was worsened with
walking. His 3rd problem was that of left hip pain as he had contused
his left hip and it was strained during the incident. On examination,
the patient had no abrasion in the thoracic spine, nor is there
bruising or erythema. There was no open wound or swelling. The
patient's range of motion was normal. He did have spasms in the
thoracic region. In the lumbar region, there was pain and spasm, but
range of motion was normal. The left hip revealed pain to palpation
with a normal range of motion. The patient underwent an x-ray of the
chest which showed no rib fractures. He underwent a thoracic x-ray
which showed no fractures and it was considered to be an unremarkable
examination. The patient underwent lumbar spine x-rays which showed
no acute fractures, there was transitional vertebral bodies, and there
was evidence of discogenic disease at the L4-L5 level. The patient
was diagnosed with a contusion of the chest wall, left scapula, lumbar
spine, as well as a strain of the thoracic spine, lumbar spine, and
left hip. It was recommended that the patient return to restricted
duty.

The patient returned to Occupational Medicine Clinic on August 29,
2013, with persistent complaints. Physical Therapy was ordered and x-
rays disclosed no evidence of acute injury. The lumbar films denoted
prior disc pathology. It was recommended that the patient performed

RE:  PASTUSZEK, DAVID
Page 9

restricted work duty with limited bending and twisting, and no
lifting, pushing, or pulling greater than 20 pounds.

From my review of an office note at Sun Orthopedics, dated October 14,
2013, the patient complained of back pain.  Mr. Pastuszek stated that
several appliances in a trailer fell on him pushing him to the floor.
He had help from someone who was there on the loading dock and was not
able to drive his truck home.  Eighteen years earlier, he had surgery
to his low back by Dr. Rajjoub.  A lumbar MRI showed slight bulging of
disk material at both L4-L5 and L5-S1, neither of which represented
surgical pathology.  Consequently, the patient was restored to
modified duty, working 2-4 hours per day, and lifting 10-20 pounds.

I was able to review a modified Oswestry Low Back Pain Disability
Questionnaire dated November 18, 2013.  There was a rating of 58%
which is indicative of symptom magnification and an exaggerated
response to a patient's pain complex.

From reviewing the evaluation of Dr. Timmons at the Geisinger Medical
Center, and a note dated July 28, 2014, the patient was found to be in
no acute distress.  His incision was healing well without signs of
infection, his motor examination was 5/5, his sensation was grossly
intact to light touch, and his gait was intact.  An MRI was reviewed
which revealed ongoing soft tissue inflammation as expected, as well
as disc removal from the prior surgery.  These were expected findings.
Of importance, is the fact that Dr. Timmons found a normal neurologic
examination.  This was again borne out on August 11, 2014, October 14,
2014, December 10, 2014, and more importantly on July 25, 2015.  On
examination, the patient's wound was well healed, his back flexion and
extension were good, and he was able to get up and down from a chair
without difficulty.  The patient had 5/5 strength of the bilateral
iliopsoas, hamstrings, quadriceps, tibialis anterior, gastrocnemius-
soleus complex, and the extensor hallucis longus.  This examination is
in sharp contradistinction to my examination which occurred
approximately 1 month later, on August 28, 2015.  I found a well-
healed wound, negative straight leg raising, forward flexion limited
to 40 degrees with complaints of low back pain, and diffuse give-way
weakness of all of the muscle groups tested in the left lower
extremity.  Furthermore, reflexes were completely normal.  This
further points out to me that the patient manifested dramatic signs of
symptom magnification and embellishment.  Straight leg raising was
negative to 90 degrees bilaterally militating against any nerve root
compression.  It is impossible to have the dramatic feigned weakness
in August 2015 when there was a normal examination by the patient's
treating physician one month earlier.  There is a disconnect between
totally normal straight leg raising to 90 degrees and forward flexion
limited to 40 degrees.  In addition, the patient's deep tendon
reflexes at the knees and ankles were 2+ and equal, which is

10-28-15;10:02AM;                                              ;                    # 10/ 1?

RE:  PASTUSZEK, DAVID
Page 10

normoactive and symmetrical.  Deep tendon reflexes are the only
portion of the neurologic examination that the patient cannot alter.
It is not surprising to me that in fact his deep tendon reflexes were
normal.  Due to the signs of symptom magnification and embellishment,
it makes it extremely difficult to assess the veracity of the
patient's complaints.

It is my impression, that as a result of the work-related incident
dated August 26, 2013, that at most the patient sustained a lumbar
sprain and strain.  He has a long history of injuries to his low back
which the patient did not disclose to me.  This withholding of
information, coupled with the symptom magnification on examination,
make it very difficult to assess the veracity of the patient's
complaints.  I believe that the patient's ongoing complaints are due
to his preexisting, unrelated lumbar degenerative disc disease.  On
none of the diagnostic studies that I reviewed, did I find any
evidence of an acute herniated nucleus pulposus.  I do not believe
that the patient requires any further treatment with respect to his
alleged work injury, and feel that he may return to his pre-injury
position without restriction.  Taking the multiple surgeries, as well
as his preexisting, unrelated lumbar degenerative disc disease, he
should be restored to light duty work, with no lifting greater than 20
pounds.  This is clearly on the basis of his lumbar degenerative disc
disease, and bears no relationship to the work incident.

The above opinions have been stated within a reasonable degree of
medical certainty.  Should any further questions arise, please do not
hesitate to contact me in the office.

                    Sincerely,



                    Gene Salkind, M.D.

MEDQ/270654/668964612
DD:  09/05/2015 09:54:00
DT:  09/05/2015 12:53:55

# EXHIBIT "D"

Gene Salkind, MD
727 Welsh Road – Suite 108
Huntingdon Valley, PA 19006
215 914-2320 Fx 215 914-2365

October 23, 2015
To: Christine Line, Esq

Re: Pastuszek v. Eletrolux Home Products, Inc., et.al.

I have reviewed the following with reference to the above
mentioned case:

- The expert report, and supplemental report, of
  Leonard A. Bruno, MD;
- The expert report and CV of Michael K. Napier, Sr.;
- EMG report of Pasquale A. Colavita, DO;
- Report of Michael J. Dunigan, DC;
- The report and CV of Bruce H, Levin, MD;
- The CV and Vocational Assessment of Sean C. Hanahue
  MA, CDMS, CRC, BCPC, LPC, ABVED;

After review of the above materials, my opinion, within a
reasonable degree of medical certainty, remains the same in that as
a result of the work-related incident dated 8/26/13, that at most the
patient sustained a lumbar sprain and strain. I do not believe that
the patient requires any further treatment with respect to his
alleged work injury, and feel that he may return to his pre-injury
position without restriction. He should be restored to light duty
work, with no lifting greater than 20 pounds, based on his lumbar
degenerative disc disease which bears no relationship to the work
incident.

Gene Salkind, MD