**IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA
CIVIL DIVISION**

DAVID PASTUSZEK and       :
BRENDA PASTUSZEK, h/w    :     JURY TRIAL DEMANDED
                              :
           Plaintiffs        :
       vs.                :
                              :     CIVIL ACTION NO.  4:14-cv-01051-MEM
ELECTROLUX HOME PRODUCTS, INC. :
           and                   :
ELECTROLUX NORTH AMERICA     :
           Defendants     :

## **ORDER**

     AND NOW, this _____ day of _____, 2016, upon consideration of

Plaintiffs David and Brenda Pastuszek's <u>Daubert</u> Motion to Preclude Robert Reed's Testimony,

and any response thereto, it is hereby **ORDERED** and **DECREED** that said Motion is

**GRANTED**.

                      BY THE COURT,

                    _____

                    THE HONORABLE MALACHY E. MANNION

**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**
**CIVIL DIVISION**

DAVID PASTUSZEK and             :
BRENDA PASTUSZEK, h/w           :        JURY TRIAL DEMANDED
                                :
            Plaintiffs          :
     vs.                        :
                                :        CIVIL ACTION NO.  4:14-cv-01051-MEM
ELECTROLUX HOME PRODUCTS, INC. :
        and                     :
ELECTROLUX NORTH AMERICA         :
            Defendants          :

## PLAINTIFFS' DAUBERT MOTION TO PRECLUDE
## ROBERT REED'S TESTIMONY

Plaintiffs David and Brenda Pastuszek, by and through their counsel Galfand Berger,

LLP, hereby file this Daubert Motion to Preclude Robert Reed's Testimony. In support thereof,

Plaintiff relies on the attached Memorandum of Law.

Respectfully Submitted,

GALFAND BERGER, LLP

BY: _____
    RICHARD M. JUREWICZ, ESQUIRE
    Attorney for Plaintiff
    I.D. No. 39436
    1835 Market Street, Suite 2710
    Philadelphia, Pa.  19103
    (215) 665-1600
    rjurewicz@galfandberger.com

**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**
**CIVIL DIVISION**

| | | |
|---|---|---|
| DAVID PASTUSZEK and | : | |
| BRENDA PASTUSZEK, h/w | : | JURY TRIAL DEMANDED |
| | : | |
| Plaintiffs | : | |
| vs. | : | |
| | : | CIVIL ACTION NO.  4:14-cv-01051-MEM |
| ELECTROLUX HOME PRODUCTS, INC. | : | |
| and | : | |
| ELECTROLUX NORTH AMERICA | : | |
| Defendants | : | |

**PLAINTIFFS' BRIEF (MEMORANDUM OF LAW)**
**IN SUPPORT OF THEIR DAUBERT MOTION TO**
**PRECLUDE ROBERT REED'S TESTIMONY**

## I.    MATTER BEFORE THE COURT

Before this Honorable Court is Plaintiffs David and Brenda Pastuszek's <u>Daubert</u> Motion

to Preclude the testimony of Defendants Electrolux Home Products, Inc. and Electrolux North

America's liability expert Robert Reed. In Reed's Report dated October 28, 2015, he offers

opinions that are entirely speculative and unsupported. All of Reed's opinions are based on either

hypothetical situations of which there is no evidence or an incorrect statement of the facts. Reed

prescribes certain actions that David Pastuszek "should have" done, but offers no source for why

Pastuszek should have done those things, other than simply because Reed says so. In other

words, Defendants wish to set forth a new standard for experts: just because he says it's so, it

must be so. Such a justification wholly fails the standard set forth by Federal Rule of Evidence

702 and <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993). As a result, Robert

Reed's testimony must be precluded, or at the very least significantly curtailed to preclude an

"expert" from opining on matters for which he does not have factual or technical support.

1

## II.     QUESTIONS PRESENTED

Should this Honorable Court preclude the testimony of Defendants' liability expert where those opinions are not supported by facts of record and where the only technical support offered is the proffered expert's *ipse dixit*?

Suggested Answer: YES.

## III.    FACTS

### A.     The Accident

This matter arises from an August 27, 2013 accident in which Plaintiff David Pastuszek, a local truck driver, was making his first stop of the day and unloading a truck that indisputably had been improperly and negligently loaded by Defendants in such a manner that an improperly stacked 247-pound commercial washer (that was placed onto a much smaller 140-pound apartment-sized refrigerator) fell and struck Plaintiff, causing him to fall to the ground.[1] Plaintiff David Pastuszek, who was acting in the course and scope of his employment with J.B. Hunt Transport, Inc., had no role whatsoever in loading or securing the load in the trailer, as it was sealed when he received it to transport to various local retailers. The Electrolux Defendants were solely responsible for loading the appliances and equipment into the truck driven by Plaintiff. A representative of Defendants admitted that the trailer was improperly loaded and secured. (Bzura Dep., excerpts attached as Exhibit A, at 77-79). Plaintiff's accident was investigated by his employer J.B. Hunt, which concluded that the accident was in no way Plaintiff's fault, but rather that the trailer had been loaded improperly by Defendant's employees. (Exhibit B). As a result of

---

[1] In August 2013 Defendant Electrolux had a Standard Operating Procedure entitled "Always and Never Product Handling Guidelines." Defendant Electrolux's Standard Operating Procedure applied to the merchandise being loaded by Defendant's employees into commercial trailers at its Pottsville Regional Distribution Center location. Defendant's Standard Operating Procedure 6.3 that was applicable in August 2013 provided, "Never stack a larger footprint on a smaller footprint. A heavy unit should never be placed on top of a letter unit." It was a violation of Defendant's Standard Operating Procedure 6.3 if any of its employees placed a heavier appliance on a lighter appliance or a larger appliance on a smaller appliance while loading a trailer at Defendant's Pottsville Regional Distribution Center location. (Electrolux Standard Operating Procedure, Exhibit F).

2

his accident, Plaintiff David Pastuszek suffered injuries to his lower back, including herniated discs in his lumbar spine and severe pain and suffering.

## B.    Reed Report

For purposes of an expert report on liability, Defendants have produced the report of Robert Reed dated October 28, 2015. (Exhibit C). Reed states that he was "contacted to perform an investigation and analyses of the circumstances of this cargo incident including the operational characteristics of tractor-trailers, the industry standards, regulations,[2] the CDL guidelines, driver training, and truck driver standard of care." (Ex. C at 2). He also claims that the elements of his methodology include "the task, the vehicle or equipment, the human element/skills, the scene/environment, management process, and process failures/actions." Id. However, Reed's CV demonstrates absolutely no training in human factors. (Ex. D).

Reed renders several opinions, each of which ignores facts of record or is wholly unsupported by any methodology or authority. Reed's opinions are that 1) Plaintiff should have inspected the cargo; 2) Plaintiff should not have turned his back to the appliances that fell on him; 3) the defect in the cargo was not latent; 4) the Electrolux Defendants were not at fault;[3] and 5) his first three opinions were the cause of the accident. (Ex. C at 5-6).

Admissions by David Bayer, the general manager of the Atlanta, Georgia regional distribution center for Defendants who was the temporary fill-in interim general manager for the Pottsville regional distribution center at the time of this accident, contradict Reed's first and third opinions:

> (Examining Exhibit No. Bayer-8, 8/26/13 Bill of Lading, One Page)

---

[2] Presumably this includes Defendants' Standard Operating Procedures for loading its trailers, which was never referenced in Redd's Report.
[3] To arrive at this opinion, Reed must have completely ignored Defendants' Standard Operating Procedure and testimony from Mr. Bayer—or pretended it did not exist.

3

> Q.      Up at the top right-hand corner, it reads, "Seal intact." I'm not sure whose handwriting that is. What does that indicate?
>
> A.      That means that the sealed number noted on the bill – on this bill of lading was intact when it got to the first stop. **In other words, the seal was not broken**. That's another reason why we do that is to ensure the fact that the load was not tampered with.
>
> Q.      Which means that from the time the load was loaded, brought to the shack and the seal put on by the guard, **at no time would Mr. Pastuszek**, or whoever the driver was of this bill of lading, had **been able to gain access to the cargo or the contents inside the trailer, otherwise, the seal would have been broken, correct**?
>
> A.      **That's correct**.

Bayer Dep., Exhibit E, at 111:20–112:14.

> Q.      But **Electrolux does have responsibility for the proper securement of the load before it's tendered to the driver, correct**?
>
> A.      **That is correct**.

Bayer Dep., Exhibit E, at 81:17-21.

Based on Bayer's testimony, Mr. Pastuszek would not have had the opportunity to inspect the load and Defendants had no expectation that he would have done so. This entirely contradicts Reed's first and third opinions (and, as a consequence, his fifth opinion).

Reed's second opinion, that Pastuszek should not have turned his back on the remaining cargo, is made without any reference whatsoever to any standard, regulation, code, or other authority that would require Pastuszek to do so. Reed merely states Pastuszek turned his back "contrary to accepted safety training regarding opening of trailer doors and unloading cargo." (Ex. C at 3). Reed is apparently completely unable to point to one single source that would support this conclusion.[4] Reed's second opinion is therefore without support, other than his own word.

---

[4] Again, Reed offers another brazen statement that completely disregards any and all evidence in this case. See Exhibits A & B.

Elsewhere in his report, Reed opines that Pastuszek "should have put cargo straps on the second wall of appliances and then moved the refrigerator out." (Ex. C at 3). Once again, Reed does not cite any authority whatsoever to support this assertion.[5]

In addition to his ultimate opinions being unsupported and contrary to damaging admissions by Defendants' employees, Reed's report contains fantasy speculation that is not tied to any facts of record. Without making a connection to any facts or offering any explanation as to why he believes the following, Reed offers this nonsensical conjecture: "The trailer *could have* been hit hard during hooking the pin, ran up over a curb or suffered a severe stop. The trailer *could have* been upon a ramped dock with the trailer on an incline to the dock, the cargo *could have* been inspected improperly or a person *could have* utilized improper unloading methods in the cargo falling. [*sic*]" (Ex. C at 5, emphasis added). These alternative "explanations" are easily testable and discoverable. The dock could have been examined to see if it was in fact on a ramp. Reed did not examine this. The trailer could have been examined for signs of being "hit hard" or testimony could have been elicited on that topic, but none was and Reed failed to examine the trailer as well.

## IV. ARGUMENT

### A. Defendants' expert offers opinions that are unsupported by proper methods and procedures and run contrary to undisputed facts of record.

Where a proposed expert offers opinions that are not supported by methods and procedures of science, but rather are only the unsubstantiated musings of that "expert," that expert must be precluded from testifying. An expert's testimony must conform to the

---

[5] Reed offers this illogical opinion despite the fact that Plaintiff was not yet even finished off-loading the appliances to be unloaded at the first stop. Reed's opinion essentially would require Plaintiff to stop his required unloading process and climb over or around a 300-pound refrigerator to secure the second load that Defendants did not secure in the first place when they originally loaded it in the trailer.

requirements of Rule 702 of the Federal Rules of Evidence in order to be admissible. Rule 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702.

The Third Circuit has stated "Rule 702 has three major requirements: (1) the proffered witness must be an expert, i.e., must be qualified; (2) the expert must testify about matters requiring scientific, technical or specialized knowledge; and (3) the expert's testimony must assist the trier of fact." Pineda v. Ford Motor Co., 520 F.3d 237, 244 (3d Cir. 2008). These requirements have been termed the "trilogy of restrictions" and have been described more concisely as consisting of qualification, reliability, and fit. Calhoun v. Yamaha Motor Corp., 351 F.3d 316, 321 (3d Cir. 2003). The second prong requires the expert's testimony to be reliable by a preponderance of the evidence and supported by "methods and procedures of science" rather than on "subjective belief or unsupported speculation." In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 744 (3d Cir. 1994) (quoting Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993)), cert denied 513 U.S. 1190 (1995) ("Paoli II"). The party offering an expert must demonstrate that the expert's conclusions are reliable by a preponderance of the evidence. Paoli II, 35 F.3d at 744. What is at issue is the expert's methodology, not the conclusions that are ultimately generated. Id. at 744. Here, there is no methodology employed by Reed to speak of.

6

When an individual is admitted as an expert, an immediate air of credibility surrounds his opinions. That is the reason for the strict guidelines of Rule 702 and the Daubert standard, as articulated in that opinion and its progeny described above. The standard for experts prevents them from simply stating thoughts and opinions that are not based on evidence of record or methods and procedures that are typically relied on by other experts in their field. See Paoli II, 35 F.3d at 744 (explaining that the methodology must constitute good grounds to reach the stated conclusions). However, that is exactly what Robert Reed has done in his report in which he repeatedly talks about what "could have" been, without referencing any basis for such opinion. He also states what Plaintiff "should have" done, although he does not cite to any standards, regulations, or codes that support that.

The statement that Plaintiff "should have pulled the dolly backward until he was out of the danger zone of the cargo" is wholly unsupported in Reed's report and represents nothing more than the *ipse dixit* of Reed. (Ex. C at 3). It cannot be that just because Reed makes a statement that it is then gospel. Similarly, Reed's assertion that Pastuszek "should have put cargo straps on the second wall of appliances and then moved the refrigerator out" lacks any citation to an authority. (Ex. C at 3). Defendants apparently expect this Court and the jury to simply "take his word for it." However, that is not what the Federal Rules of Evidence or Daubert provide for. An "expert's opinion must be based on the methods and procedures of science rather than on subjective belief or unsupported speculation." Paoli II, supra at 742. Conclusory statements based upon speculation and unreliable methodology are the exact type of opinions that Daubert and its progeny label as inadmissible. "[N]othing in Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." General Electric Co. v. Joiner, 522 U.S. 136, 146 (1997). Although

7

experts commonly extrapolate from the available data, district courts "may conclude there is too great an analytical gap between the data and the opinion proffered." Id.

Despite the stringent standard to which experts are held, Reed simply speculates on other possible causes, although with a proper investigation, those causes could have easily been ruled out.

> The mere fact that cargo fell in an incident is not an indicator that the load was not secured properly or loaded properly. The trailer *could have* been hit hard during hooking the pin, ran up over a curb or suffered a severe stop. The trailer *could have* been upon a ramped dock with the trailer on an incline to the dock, the cargo *could have* been inspected improperly or a person *could have* utilized improper unloading methods in the cargo falling. [*sic*]

Exhibit C at 5 (emphasis added).

The trailer being "hit hard" or the dock being on a "ramp" are both testable assertions that Reed failed to actually analyze. This speculation and conjecture is wholly unsupported and not tied to any facts. Reed cannot be permitted to spout conjecture on the witness stand. Further, his other hypothetical "causes" for why the cargo fell do not actually offer any explanation as to why it fell. A cargo allegedly not being inspected properly and a worker turning his back on stacked appliances that were supposed to be secured do not explain *why* that cargo fell. Reed's "hypotheticals" are all either unsupported by facts or complete non sequiturs that do not actually offer an explanation for why the cargo fell, as Reed alleges they do.

The speculation of Reed is analogous to that of the plaintiff's expert in State Farm Fire & Cas. Co. v. Holmes Prods., 165 Fed. Appx. 182, 184-186 (3d Cir. 2006). There, the expert claimed a lamp caused draperies to catch fire after the family's pet dog pulled the draperies over the lamp. Id. at 184-85. This conclusion was determined to be nothing more than speculation as it had no factual support, thereby precluding the expert from offering his testimony at trial. Id.

The expert's theory of the dog's involvement in starting the fire "was not sufficiently supported by evidence in the record" and was stated in terms of "mere possibilities." Id. at 186. In exactly the same way, Reed has attempted to list "mere possibilities" for other causes, though none of those possibilities are supported by any evidence of record and in fact Reed's hypotheticals can be ruled out based on evidence of record. "It is an abuse of discretion to admit expert testimony which is based on assumptions lacking any factual foundation in the record." Stecyk v. Bell Helicopter Textron, Inc., 295 F.3d 408, 414 (3d Cir. 2002).

Reed even goes beyond making assumptions and actually offers his opinions to try and create facts that are contrary to the actual record. Reed's opinion that Plaintiff should have inspected the cargo load is inadmissible as the underlying factual assumption is contradicted by admissions from Defendants' general manager. David Bayer, a representative for Defendants who is the general manager of the Atlanta, Georgia regional distribution center for Defendants and who was the interim general manager for the Pottsville regional distribution center at the time of this accident, admitted that the load in question was sealed and could not have been accessed by Plaintiff. Therefore it is not only a nonexistent duty that Reed imposes on Plaintiff, it is one that literally would have been impossibly to undertake. Even if Plaintiff had somehow been able to conduct an inspection, the Injury Investigation Report from J.B. Hunt concluded, "THERE IS NO WAY TO KNOW WHEN A BOX IS GOING TO COLLAPSE FROM WEIGHT AND FALL ON DRIVER! THIS CAN HAPPEN AT ANY TIME WITH NO WARNING!!" (Exhibit B).

Similarly, Reed opined that Plaintiff should have secured the appliances for the second delivery as he was unloading the first. According to Bayer, there is no such duty, as securing the load is the responsibility of Defendants. Ex. E at 81:17-21. Where an expert bases his opinion on

9

information that is too attenuated from the evidence of the case or that evidence is so unreliable that an expert could not reasonably rely on it, then that opinion must be precluded. <u>Montgomery County v. Microvote Corp.</u>, 320 F.3d 440, 448 (3d Cir. 2003).

As Reed's opinions are based on pure speculation and errant interpretations of facts and lack citation to any specific authority that would impose the duties on Plaintiff that Reed asserts, Reed's opinions will not assist the trier of fact and must be precluded. <u>Stecyk v. Bell Helicopter Textron, Inc.</u>, 295 F.3d 408, 414 (3d Cir. 2002); <u>Elcock v. Kmart Corp.</u>, 233 F.3d 734, 756 n.13 (3d Cir. 2000).

## V.   RELIEF REQUESTED

For the reasons set forth at length above, Plaintiffs respectfully request that this Honorable Court preclude Defendants' liability expert Robert Reed from testifying.

Respectfully Submitted,

GALFAND BERGER, LLP

BY: _____
RICHARD M. JUREWICZ, ESQUIRE
Attorney for Plaintiffs
I.D. No. 39436
1835 Market Street, Suite 2710
Philadelphia, Pa.  19103
(215) 665-1600
rjurewicz@galfandberger.com

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA
CIVIL DIVISION

DAVID PASTUSZEK and                              :
BRENDA PASTUSZEK, h/w                            :           JURY TRIAL DEMANDED
                                                 :
                          Plaintiffs             :
            vs.                                  :
                                                 :           CIVIL ACTION NO.  4:14-cv-01051-MEM
ELECTROLUX HOME PRODUCTS, INC. :
            and                                  :
ELECTROLUX NORTH AMERICA                         :
                          Defendants             :


## CERTIFICATE OF NONCONCURRENCE

I, Richard M. Jurewicz, Esquire, certify that I requested counsel for Defendants'

concurrence in Plaintiffs David and Brenda Pastuszek's Daubert Motion to Preclude Robert

Reed's Testimony pursuant to LR 7.1 and the parties could not agree.

GALFAND BERGER, LLP

BY: _____

RICHARD M. JUREWICZ, ESQUIRE
Attorney for Plaintiff
I.D. No. 39436
1835 Market Street, Suite 2710
Philadelphia, Pa.  19103
(215) 665-1600
rjurewicz@galfandberger.com

**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**
**CIVIL DIVISION**

| | | |
|---|---|---|
| DAVID PASTUSZEK and | : | |
| BRENDA PASTUSZEK, h/w | : | JURY TRIAL DEMANDED |
| | : | |
| Plaintiffs | : | |
| vs. | : | |
| | : | CIVIL ACTION NO. 4:14-cv-01051-MEM |
| ELECTROLUX HOME PRODUCTS, INC. | : | |
| and | : | |
| ELECTROLUX NORTH AMERICA | : | |
| Defendants | : | |

## CERTIFICATE OF SERVICE

I, Richard M. Jurewicz, Esquire, hereby certify that a true and correct copy of Plaintiffs

David and Brenda Pastuszek's <u>Daubert</u> Motion to Preclude Robert Reed's Testimony  was sent

to counsel below via email:

Frederick W. Bode, III, Esquire
Bryon R. Kaster, Esquire
Christine L. Line, Esquire
DICKIE, McCAMEY & CHILCOTE, P.C.
425 North 21st Street, Suite 302
Camp Hill, Pa.  17011-2223
*Attorneys for Defendants, Electrolux Home Products, Inc. and Electrolux North America*
fbode@dmclaw.com
bkaster@dmclaw.com
cline@dmclaw.com

GALFAND BERGER, LLP

BY:  _____
RICHARD M. JUREWICZ, ESQUIRE
Attorney for Plaintiffs
1835 Market Street, Suite 2710
Philadelphia, Pa.  19103
(215) 665-1600
I.D. No. 39436
rjurewicz@galfandberger.com

# EXHIBIT "A"

**Page 1**

```
 1        IN THE UNITED STATES DISTRICT COURT
 2       FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
 3    ---------------------------x
      DAVID PASTUSZEK & BRENDA  :  NO. 4:14-CV-01051-MEM
 4    PASTUSZEK, h/w,           :
              Plaintiff(s),     :
 5                              :
                               :
 6            v.               :
                               :
      ELECTROLUX HOME PRODUCTS, :
 7    INC., et al.,            :
              Defendant(s).    :
 8    ---------------------------x
 9                - - -
              May 28, 2015
10                - - -
11        Oral deposition of MARTIN C. BZURA, held
12    at the law offices of Michael J. O'Connor, 608
13    W. Oak Street, Frackville, Pa., 17921, beginning
14    at 11:50 a.m., on the above date, before Denise
15    D. Bach, a Registered Professional Reporter and
16    Notary Public.
17
18
19
              ESQUIRE DEPOSITION SOLUTIONS
20               1835 Market Street
                    Suite 2600
21          Philadelphia, Pennsylvania 19103
                  (215) 988-9191
22
23
24
```

**Page 2**

```
 1    APPEARANCES:
 2
 3        GALFAND BERGER, LLP
          BY: RICHARD M. JUREWICZ, ESQUIRE
 4        Suite 2710
          1835 Market Street
 5        Philadelphia, PA 19103
          215.665.1600
 6        rjurewicz@galfandberger.com
          --Representing the Plaintiff(s)
 7
 8        DICKIE McCAMEY & CHILCOTE, P.C.
          BY: CHRISTINE L. LINE, ESQUIRE
 9        Plaza 21, Suite 302
          425 North 21st Street
10        Camp Hill, PA 17011
          717.731.4800
11        cline@dmclaw.com
          --Representing the Defendant(s)
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**Page 3**

```
 1              I N D E X
 2    WITNESS                          PAGE
      MARTIN C. BZURA
 3    By Mr. Jurewicz                    5
      BY Ms. Line                       81
 4
 5           E X H I B I T S
 6    MARKED       DESCRIPTION         PAGE
 7          (No Exhibits Were Marked.)
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**Page 4**

```
 1        DEPOSITION SUPPORT INDEX
 2
 3     DIRECTION TO WITNESS NOT TO ANSWER
 4    Page  Line     Page  Line     Page  Line
 5     (None)
 6
 7
 8     REQUEST FOR PRODUCTION OF DOCUMENTS
 9    Page  Line     Page  Line     Page  Line
10     (None)
11
12
13            STIPULATIONS
14    Page  Line     Page  Line     Page  Line
15     5    2
16
17
18            QUESTIONS MARKED
19    Page  Line     Page  Line     Page  Line
20     (None)
21
22
23
24
```



Page 77

1  Mr. Pastuszek was delivering for his drop-offs
2  had been improperly loaded?
3      A.   No.
4      Q.   Did Vince Messina ever tell you
5  that the trailer was improperly loaded, the one
6  that was involved in Mr. Pastuszek's accident?
7      A.   Yeah.
8      Q.   When did he tell you that?
9      A.   I can't remember exactly when.
10     Q.   What did he tell you?
11     A.   That it was improperly loaded and
12  Dave got hurt.
13     Q.   Did he tell you how it was
14  improperly loaded?
15     A.   No; because I will have to step in
16  here in just a minute.  It was later that day
17  that that trailer did get returned.  Okay.  And
18  they called the ops clerk.  The ops clerk told
19  me and then Dave Bayer came out, we went over,
20  opened the door, looked at it.  At that point,
21  there was stuff laying all over the floor that
22  wasn't secured.  But I can't say that didn't
23  happen in transit bringing it back, we just saw
24  there was, you know, stuff left.

Page 78

1          That trailer had to get offloaded,
2  but, like I said, that was late afternoon, that
3  was maybe like 2 o'clock and we were going at
4  2:30.  But I had seen the trailer that got
5  returned, and the load, it was laying all over
6  the place, but it wasn't secure.  And I want to
7  say, if I was a guessing man, it was like
8  halfway unloaded.
9          MS. LINE:  Objection.
10         THE WITNESS:  And that's all I
11  seen.
12         MS. LINE:  Can we establish that
13  he is only to answer a question if he knows the
14  answer and not to give a speculative or a
15  guessing answer?
16         MR. JUREWICZ:  If you want to
17  clean that up with him.  I'm perfectly happy
18  with what he has to say.
19         I think all objections except as
20  to the form of the question are reserved.
21  BY MR. JUREWICZ:
22     Q.   What did Vince tell you, Messina
23  that is, as to why in his belief he thought the
24  trailer that was loaded for Dave Pastuszek to

Page 79

1  deliver had been improperly loaded?
2      A.   Because something fell on Dave.
3      Q.   And is something ordinarily not
4  supposed to fall if a trailer is loaded
5  properly?
6      A.   Correct.
7      Q.   And the reason for that is either
8  the load's going to be secured by blocking or
9  it's going to be shrink wrapped if it's a
10  multi-load --
11     A.   Stop.
12     Q.   -- or dunnage, something to
13  prevent the second, third and load closest to
14  the bulkhead to shift or move, right?
15     A.   Correct.
16     Q.   When you opened up -- when you saw
17  the trailer that was brought back, did you see
18  any shrink wrapping that was laying around?
19     A.   No.
20     Q.   All right.  Did you see anything
21  in the trailer that would indicate that that
22  second load from the bulkhead had been shrunk
23  wrapped?
24     A.   No, I can't say I did.

Page 80

1      Q.   Did you see any dunnage in there
2  that would indicate that there was -- that that
3  load had been secured?
4      A.   No.
5      Q.   Did you see any, you know -- do
6  you know what brace poles are?
7      A.   Yes.
8      Q.   Did you see any brace poles
9  securing the load?
10     A.   No.
11     Q.   In the past when your men have
12  loaded trailers, have they used dunnage between,
13  let's say, a first load and second load or
14  second load and third load?
15     A.   If need be.
16     Q.   And have they used shrink wrap
17  between the first load and second load or third
18  load and fourth load?
19     A.   Yes, they did.
20     Q.   And have they used jam poles or
21  braces between the first load, second load or
22  second load and third load, if needed?
23     A.   Yes, they did.
24     Q.   And the decision to use dunnage,



# EXHIBIT "B"

# Injury Investigation Report

| Alpha Code: | PASD6 | Board Code: | 3S@ | Name: | DAVID PASTUSZEK |
|---|---|---|---|---|---|
| Hire Date: | 11/01/2010 | City: | | State: | |

| Team Leader/OM: | Mike Forrest/Corporate/JBHunt | Safety Manager/ARM: | Shawn Would |
|---|---|---|---|
| Fleet/Project Manager: | Rich Hostetler | EventNumber: | 873641 |
| Truck Director/VP: | Bryan Schwenk/Corporate/JBHunt | Project: | |

| Date of Injury: | 27 AUG 2013 | Date Reported: | 27 AUG 2013 |
|---|---|---|---|
| Type of Injury (ie Lumbar Strain, Laceration): | DRIVER HAS SEVERE PAIN IN HIS BACK, RIBS, AND HEAD | | |
| Body part affected: | BACK, RIBS, AND HEAD | | |
| Initial Treatment: | Doctors Appointment | | |
| How did injury occur? | DRIVER WAS UNLOADING APPLIANCES FOR 1ST STOP WHEN DRIVER WENT TO GRAB LAST PIECE A WASHING MACHINE AND 2 GAS RANGES FELL ON THE DRIVER | | |
| What caused injury (i.e., Slippery surface, faulty equipment, etc.) | ATER TALKING WITH DRIVER AND WAREHOUSE SUPERVISOR AT RDC  THIS WAS A DIRECT RESULT OF IMPROPER LOADING BY SHIPPER.  THERE IS NO WAY TO KNOW WHEN A BOX IS GOING TO COLLAPSE FROM WEIGHT AND FALL ON DRIVER!  THIS CAN HAPPEN AT ANY TIME WITH NO WARNING!! | | |
| Activity at time of Injury? | UNLOADING | | |
| Factors that contributed to the incident: | IMPROPER LOADING BY SHIPPER AS BOX HAD CRUSH DAMAGE THAT IN TURN LED LED TO APPLIANCES FALLING ON DRIVER AFTER HE MOVED REFRIGERATOR WHICH WAS HOLD THEM UP FROM FALLING | | |
| Witness Name: | N/A | | |
| Account of Incident: | N/A | | |
| Witness Name: | N/A | | |
| Account of Incident: | N/A | | |
| Was proper equipment used for task? | | ● Yes ○ No | |
| Explain | | | |
| Was personal protective equipment used? | | ● Yes ○ No | |
| Explain | | | |
| Were appropriate safeguards in place? | | ● Yes ○ No | |
| Explain | | | |
| Is there a JSA for the activity/task that was performed? | | ● Yes ○ No | |
| Explain | | | |
| Were JSA steps being followed at the time of the injury? | | ● Yes ○ No | |
| Explain | | | |
| Had the employee been trained on the JSA and is it documented. | | ● Yes ○ No | |
| Explain | | | |
| Corrective Actions JSA Training? | | ○ Yes ● No | |
| Prevention Plan | NOTHING DRIVER COULD HAVE DONE DIFFERENTLY BECAUSE NOTHING WAS LEANING FORWARD OR OBVIOUSLY SHOWING IT WOULD FALL HAD HE REMOVED REFRIGERATOR | | |

| | Signature | Date |
|---|---|---|
| Supervisor | | |

PASDC  *[signature]*        5 Sep 13

# EXHIBIT "C"

IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE
DISTRICT OF PENNSYLVANIA

David and Brenda Pastuszek                                      October 28, 2015

    v.

                             Civil Action No.4:14-CV-01051

Electrolux Home Products Inc. et al

Robert Reed Report/Analysis

## BACKGROUND

This investigation and report reflects upon the conditions, issues, facts, research, discovery documents, sworn testimony, and probative evidence in a cargo incident that occurred in Allentown, Pennsylvania on August 27, 2013 after 5:30AM. The trailer and cargo were picked up at the Electrolux Distribution Center in Pottsville, Pennsylvania and driven for an hour and fifteen minutes to Allentown, Pennsylvania for the first stop delivery.

## SCOPE OF ASSIGNMENT

This writer was contacted to perform an investigation and analyses of the circumstances of this cargo incident including the operational characteristics of tractor-trailers, the industry standards, regulations, the CDL guidelines, driver training and truck driver standard of care.

The analysis was performed utilizing my education, skills, research, knowledge and practical experience of tractor-trailer operation, cargo loading and unloading, CDL examiner testing and CDL training duties. My special training and instruction as an industry safety person and vocational school instructor was also utilized in the analysis.

The elements of Accident Analysis & Investigation methodology was used for root causal factors and opinions. The elements of the methodology include the task, the vehicle or equipment, the human element/skills, the scene/environment, management process, and process failures/actions.

The scene of the event was evaluated through testimony, photos, the reports and exhibits and Google Earth satellite views.

2

## A.  TRUCK DRIVER – DAVID PASTUSZEK

Mr. Pastuszek acquired his professional commercial driver's license (CDL) in 1995. He had worked as an owner-operator driving his own tractor-trailer for United Van Lines for 17 years. Mr. Pastuszek had training in previous employment with Robert Cellitti moving and storage in appliances, furniture and electronics. He was employed by J. B. Hunt in 2010 for the Electrolux Distribution Center account that they had under a contract for transportation of their appliances.

Mr. Pastuszek had received training from J. B. Hunt on handling appliances and had training in J. B. Hunt's JSA on handling appliances. As a professional truck driver he was under the regulation of the Federal Motor Carrier Safety Regulations. J. B. Hunt was also governed under these same Federal Motor Carrier Safety Regulations. While he was unloading appliances he was under the jurisdiction of OSHA. Mr. Pastuszek would have to receive training in material handling at 1910.176 and other regulations pertaining to his duties.

When Mr. Pastuszek picked up his trailer at Electrolux at approximately 3:45AM, he stated he performed his pre-trip inspection of his unit. He certainly would have used his flashlight to check his tires, brakes and undercarriage of his tractor and trailer. Mr. Pastuszek did not check his load as prescribed in 49CFR 392.9. The trailer was not sealed or locked in the yard until he hooked to it and pulled it to the guard gate. Mr. Pastuszek could have opened the doors to check his cargo and install the tie-down straps that he carried in his tractor if needed. The guard or he put the seal on the doors after the load is checked for the destination. This trailer was certainly not a sealed load that the driver could not check or inspect the load. To distinguish, a sealed load has a seal put on it after loaded and before staging in the yard for driver pick-up, which would not permit the driver to examine the load.

## B.  THE CARGO INCIDENT

The cargo incident occurred at the first stop in Allentown, PA. after Mr. Pastuszek had unloaded 13 appliances and was on his last refrigerator for that stop. He was using a hand cart dolly to move the appliances. The appliances were put in the trailer in walls for the four stops of the load. It was loaded tightly and interlocked and proof was that the rear doors of the trailer were opened and no cargo or appliances fell out or were out of place.

This was not a FMCSA accident as under the definition of an accident at 49CFR 390.5 states that an occurrence of loading and unloading cargo is not a covered accident. This was not a securement of cargo incident for Electrolux as stated previously the doors were opened and no cargo fell from the truck. This reflects that the load was packed tightly and correct in the trailer.

3

The load did not fall, blow from, leak or shift upon the vehicle to such an extent that the vehicles stability or maneuverability was affected. See 49CFR 393.100. See Exhibit 1.

Mr. Pastuszek put his final appliance (refrigerator) for this stop on the dolly, tilted it back to move it backward and turned around to go forward out of the trailer when the stack of appliances behind the refrigerator fell. He said he checked the appliances behind the refrigerator and he allegedly looked before he pulled but he did not have his flashlight in the trailer with him and any light coming into the trailer would have been blocked by the height of the refrigerator. Also, he turned his back to the stack of freight and this is contrary to accepted safety training regarding opening of trailer doors and unloading cargo. Mr. Pastuszek should have pulled the dolly backward until he was out of the danger zone of the cargo and turned the dolly around to go forward out of the trailer. If the cargo fell, he would have been safe and out the path of the falling cargo. The photos reflect that he had ample room to perform this maneuver.

He stated in his deposition that he only needed glasses for reading and was not wearing them at the time of the incident.

The shipper signature/certification block on the Bill of Lading for the load in question has to do with hazardous materials shipping under 49CFR 172.204. It has nothing to do with this load as the appliances were not hazardous materials. This is a longstanding rule of shipping hazardous materials. See Exhibit 2

## C.  CARGO VAN SECUREMENT

The securement in cargo vans has been set forth in training materials and the Federal Register prior to this incident. The use of loading patterns that lock the cargo together and keep it secure during transport is the most widely used procedure for shipping cargo in van trailers. Depending on the size and bulk of the cargo, netting and load bars are sometimes used at the end of the trailer to protect drivers when opening the doors for delivery from falling cargo.

The load in this circumstance was transported to the dock and the doors opened without any falling cargo or injury to the driver, Mr. Pastuszek. The cargo that fell was from another stop that was behind the cargo that Mr. Pastuszek was unloading. Mr. Pastuszek was responsible for checking his cargo at all change of duties and his change of duty was when he was unloading after driving to the first stop. He stated he looked and the load was in good order. While unloading the last piece for the first stop, he moved the refrigerator out from the appliances for the second stop, the wall of freight for the second stop became unstable. He should have put cargo straps on the second wall of appliances and then moved the refrigerator out. As the cargo would have been held stable and not have fallen. He stated that he used his cargo straps for securement on the next stops load

4

Mr. Pastuszek could not have performed an adequate inspection of the additional cargo in his trailer without using his flashlight.

The way that Electrolux and this trailer was loaded is consistent with training materials and the Federal Motor Carrier Safety Administration as noted in Exhibit 3 for securement of cargo and Federal Register page 33432.

## D. J. B. HUNT FLEET MANAGER - RICHARD HOSTETLER

Mr. Hostetler had been the fleet manager for approximately two years prior to Mr. Pastuszek's incident. He testified that this was the first time anyone was injured by falling cargo. Mr. Hostetler had 10 J. B. Hunt drivers employed at the Electrolux Distribution Center. J. B. Hunt transported approximately 45 loads of Electrolux appliances each week.

Mr. Hostetler stated in his deposition that there is no way to know when a box is going to collapse from weight and fall on a driver and this can happen anytime with no warning. This writer agrees, and that is why you don't turn you back to a stack of cargo.

He also stated that the drivers pull to the guard shack with the doors open. The driver then closes the doors and seals the trailer in front of them. He stated most drivers would look in the back, if they wanted to put load straps in to secure stuff they would get in. This also reflects that the trailers were not sealed before the driver could check the load during their pre-trip inspection. The guard would come visibly verify the product was in the trailer at the guard gate and watch the driver shut the doors and put the J. B. Hunt seal on the trailer.

## E. SUMMARY AND CONCLUSIONS

The FMCSA regulations are clear that the truck driver must perform an inspection of his cargo during his pre-trip inspection and testimony is clear from multiple persons including Mr. Pastuszek that this trailer was not sealed at the time he picked it up. Other J. B. Hunt drivers completed an inspection and secured their cargo with their cargo straps.

Mr. Pastuszek did not check his cargo on his pre-trip inspection or check his cargo when the door was opened at the guard gate according to his own testimony.

The cargo falling was not a latent defect that could not be detected by a reasonable truck driver cargo inspection.

5

The J. B. Hunt Job Safety Analysis (JSA'S) would reflect the training in proper procedures for picking up his trailer, his inspections and for safely unloading the cargo in the trailer. They are widely used in industry for employee guidance and training. Mr. Pastuszek did not know what a JSA was when asked in his deposition.

The mere fact that cargo fell in an incident is not an indicator that the load was not secured properly or loaded properly. The trailer could have been hit hard during hooking the pin, ran up over a curb or suffered a severe stop. The trailer could have been upon a ramped dock with the trailer on an incline to the dock, the cargo could have been inspected improperly or a person could have utilized improper unloading methods in the cargo falling.

The testimony of Electrolux loads being improper was due to stops being loaded out of order which has nothing to do with load securement, a falling cargo issue or this loaded trailer. Mr. Pastuszek never reported this load as improper or had the trailer reloaded before his departure. This was the first cargo incident of injury from falling cargo over a two year period.

The Interpretations and guidance for 49CFR 392.9 was published April 4, 1997 at Federal Register page 16413 and is still current in today's guidance concerning shipper not being responsible for cargo securement if the shipper is not the motor carrier. The guidance states that it is the responsibility of the motor carrier and the driver to ensure that any cargo aboard a vehicle is loaded and secured properly. See Exhibit 2.

The report of Michael Napier was subjective and disregarded clear testimony about the trailer not being sealed until at the gate and disregarded mandated duties of the truck driver inspections and securement of cargo.


## C. OPINIONS

After careful review of the supplied discovery materials and research utilizing my specialized education, knowledge, skills and practical experience, these findings are concluded to a reasonable degree of technical and professional certainty and probability. The following opinions regarding the circumstances of the incident on August 27, 2013 are:

1. *David Pastuszek did not perform a reasonable inspection of his cargo when picked up or at his first stop during unloading according to 49 CRF 392.9.*

2. *David Pastuszek should have not turned his back to the appliances when he was in an area of danger of any falling cargo.*

3. *The reported defect in the cargo was not latent to David Pastuszek.*

*6*

*4. This incident was not an Electrolux securement of cargo issue.*

*5. Opinions 1, 2, and, 3, were causal factors of the cargo falling incident.*

## D. ITEMS REVIEWED / RESEARCHED

1. Deposition of David Pastuszek w/exhibits
2. Deposition of Richard Hostetler w/exhibits
3. Deposition of Vincent Messina w/exhibits
4. Deposition of David Bayer w/exhibits
5. Deposition of Martin Bzura
6. Deposition of Brenda Pastuszek
7. Deposition of Mark Macaluso
8. J. B. Hunt Documents Vol. 1-3
9. Electrolux Handbook
10. J. B. Hunt Injury Investigation Report
11. Original Model Driver's Manual for Commercial Drivers' – USDOT -1989
12. PA. CDL Manual 2014
13. CVSA/ATA Practical Cargo Securement Manual - 2008
14. Model Curriculum for Training Tractor Trailer Drivers – USDOT - 1985
15. 2012 49CFR Regulations
16. JJ Keller Tractor-Trailer Driver Training Manual – 2005
17. Numerous Photographs
18. www.gpoaccess.gov.
19. www.fmcsa.dot.gov
21. www.earth.google.com
22. www.federalregister.gov
23. 2010 J. B. Hunt Drivers Manual
24. 2012 J. B. Hunt Drivers Manual
25. www.truckmiles.com
26. Reed Exhibits 1-3
27. www.earth.google.com
28. The Bill of Lading
29. www.osha.gov

7

## E. ROBERT REED – QUALIFICATIONS

My experience, training and education spans over 35 years in the trucking industry with 10 years in management positions of safety and maintenance director. My career also includes training and certification as an Ohio Vocational School Instructor for Tractor-Trailer Drivers.

My experience includes specialized training as a CDL Examiner for the state of Ohio and I have performed hundreds of CDL examinations for the Ohio Department Public Safety. I have also provided training to hundreds of drivers in the CDL requirements, testing, and FMCSA rules and regulations.

My training and certification includes being a certified Train the Trainer and I have accident reconstruction/investigation and accident analysis training and experience. I have had a CDL license for 26 years and operated tractor-trailers and trucks in commerce for over 40 years.

My motor carrier employment has included contracts for hauling for Sears Logistics and K-Mart Corporation with similar cargo issues as this incident.

I have provided training and consulted to the legal community since 1989 and testified in numerous state and federal courts in Ohio, West Virginia, Michigan, New Jersey, Texas, Kansas, New Mexico, Florida and Connecticut. My CV and fee schedule are attached.

Exhibits 1-3 are part of this report as support for opinions and conclusions.

- *These opinions and conclusions are based on a reasonable degree of probability and technical and professional certainty utilizing sworn testimony, reports, exhibits and materials supplied, existing data, information and facts of this particular incident that were analyzed and/or researched concurrently with my specialized practical knowledge, education, training, skills and employment experience. The opinions stated may change or expand as new materials or facts develop or are introduced to this circumstance.*

*Robert Reed*

Reed Transportation Service Inc.
Columbus, Ohio 43228

# 2012 Regulations

Wednesday, October 07, 2015
11:48 AM

one hazard class) contains the name of the chemical element or group responsible for the material meeting the definition of one of those classes. In such cases, only the technical name of the component that is not appropriately identified in the n.o.s. description shall be entered in parentheses.

(l) *Marine pollutants.* (1) If the proper shipping name for a material which is a marine pollutant does not identify by name the component which makes the material a marine pollutant, the name of that component must appear in parentheses in association with the basic description. Where two or more components which make a material a marine pollutant are present, the names of at least two of the components most predominantly contributing to the marine pollutant designation must appear in parentheses in association with the basic description.

(2) The words "Marine Pollutant" shall be entered in association with the basic description for a material which is a marine pollutant.

(3) Except for transportation by vessel, marine pollutants subject to the provisions of 49 CFR 130.11 are excepted from the requirements of paragraph (l) of this section if a phrase indicating the material is an oil is placed in association with the basic description.

(4) Except when all or part of transportation is by vessel, marine pollutants in non-bulk packagings are not subject to the requirements of paragraphs (l)(1) and (l)(2) of this section (see §171.4 of this subchapter).

(m) *Poisonous Materials.* Notwithstanding the hazard class to which a material is assigned, for materials that are poisonous by inhalation (see §171.8 of this subchapter), the words "Poison-Inhalation Hazard" or "Toxic-Inhalation Hazard" and the words "Zone A", "Zone B", "Zone C", or "Zone D" for gases or "Zone A" or "Zone B" for liquids, as appropriate, shall be entered on the shipping paper immediately following the shipping description. The word "Poison" or "Toxic" need not be repeated if it otherwise appears in the shipping description.

(n) *Elevated temperature materials.* If a liquid material in a package meets the definition of an elevated temperature material in §171.8 of this subchapter

and the fact that it is an elevated temperature material is not disclosed in the proper shipping name (for example, when the words "Molten" or "Elevated temperature" are part of the proper shipping name), the word "HOT" must immediately precede the proper shipping name of the material on the shipping paper.

(o) *Organic peroxides and self-reactive materials.* The description on a shipping paper for a Division 4.1 (self-reactive) material or a Division 5.2 (organic peroxide) material must include the following additional information, as appropriate:

(1) If notification or competent authority approval is required, the shipping paper must contain a statement of approval of the classification and conditions of transport.

(2) For Division 4.1 (self-reactive) and Division 5.2 (organic peroxide) materials that require temperature control during transport, the control and emergency temperature must be included on the shipping paper.

(3) The word "SAMPLE" must be included in association with the basic description when a sample of a Division 4.1 (self-reactive) material (see §173.224(c)(3) of this subchapter) or Division 5.2 (organic peroxide) material (see §173.225(b)(2) of this subchapter) is offered for transportation.

(p) *Liquefied petroleum gas (LPG).* The word "non-odorized" or "not-odorized" must be included in association with the proper shipping description on a shipping paper when non-odorized liquefied petroleum gas is offered for transportation.

[Amdt. 172-29A, 61 FR 49677, Sept. 20, 1996]

EDITORIAL NOTE: For FEDERAL REGISTER citations affecting §172.203, see the List of CFR Sections Affected, which appears in the Finding Aids section of the printed volume and at *www.fdsys.gov*.

## §172.204 Shipper's certification.

(a) *General.* Except as provided in paragraphs (b) and (c) of this section, each person who offers a hazardous material for transportation shall certify

that the material is offered for transportation in accordance with this subchapter by printing (manually or mechanically) on the shipping paper containing the required shipping description the certification contained in paragraph (a)(1) of this section or the certification (declaration) using the language contained in paragraph (a)(2) of this section. For transportation by rail only, the certification may be received verbally or with an electronic signature in conformance with paragraphs (a)(3)(i) and (a)(3)(ii) of this section.

(1) "This is to certify that the above-named materials are properly classified, described, packaged, marked and labeled, and are in proper condition for transportation according to the applicable regulations of the Department of Transportation."

NOTE: In line one of the certification the words "herein-named" may be substituted for the words "above-named".

(2) "I hereby declare that the contents of this consignment are fully and accurately described above by the proper shipping name, and are classified, packaged, marked and labelled placarded, and are in all respects in proper condition for transport according to applicable international and national governmental regulations."

(3) Rail only certifications. For transportation by rail, the shipping paper certification may also be accomplished by one of the following methods:

(i) Verbal Certification. When received telephonically, by the carrier reading the complete shipping description that will accompany the shipment back to the offeror and receiving verbal acknowledgment that the description is as required. This verbal acknowledgement must be recorded, either on the shipping document or in a separate record, e.g., the waybill, in accordance with § 174.24, and must include the date and name of the person who provided this information; or

(ii) Electronic Signature Certification. When transmitted electronically, by completing the field designated for the shipper's signature, the shipper is also certifying its compliance with the certification specified in § 172.204(a)." The name of the principal partner, officer, or employee of the offeror or their

agent must be substituted for the asterisks;

(b) Exceptions. (1) Except for a hazardous waste, no certification is required for a hazardous material offered for transportation by motor vehicle and transported:

(i) In a cargo tank supplied by the carrier, or

(ii) By the shipper as a private carrier except for a hazardous material that is to be reshipped or transferred from one carrier to another.

(2) No certification is required for the return of an empty tank car which previously contained a hazardous material and which has not been cleaned or purged.

(c) Transportation by air—(1) General. Certification containing the following language may be used in place of the certification required by paragraph (a) of this section:

I hereby certify that the contents of this consignment are fully and accurately described above by proper shipping name and are classified, packaged, marked and labeled, and in proper condition for carriage by air according to applicable national governmental regulations.

NOTE TO PARAGRAPH (c)(1): In the certification, the word "packed" may be used instead of the word "packaged" until October 1, 2010.

(2) Certificate in duplicate. Each person who offers a hazardous material to an aircraft operator for transportation by air shall provide two copies of the certification required in this section. (See § 175.30 of this subchapter.)

(3) Additional certification requirements. Effective October 1, 2006, each person who offers a hazardous material for transportation by air must add to the certification required in this section the following statement:

"I declare that all of the applicable air transport requirements have been met."

(i) Each person who offers any package or overpack of hazardous materials for transport by air must ensure that:

(A) The articles or substances are not prohibited for transport by air (see the § 172.101 Table);

(B) The articles or substances are properly classed, marked and labeled and otherwise in a condition for transport as required by this subchapter;

(C) The articles or substances are packaged in accordance with all the applicable air transport requirements, including appropriate types of packaging that conform to the packing requirements and the "A" Special Provisions in §172.102; inner packaging and maximum quantity per package limits; the compatibility requirements (see, for example, §173.24 of this subchapter); and requirements for closure for both inner and outer packagings, absorbent materials, and pressure differential in §173.27 of this subchapter. Other requirements may also apply. For example, single packagings may be prohibited, inner packaging may need to be packed in intermediate packagings, and certain materials may be required to be transported in packagings meeting a more stringent performance level.

(ii) [Reserved]

(4) *Radioactive material.* Each person who offers any radioactive material for transportation aboard a passenger-carrying aircraft shall sign (mechanically or manually) a printed certificate stating that the shipment contains radioactive material intended for use in, or incident to, research, or medical diagnosis or treatment.

(d) *Signature.* The certifications required by paragraph (a) or (c) of this section:

(1) Must be legibly signed by a principal, officer, partner, or employee of the shipper or his agent; and

(2) May be legibly signed manually, by typewriter, or by other mechanical means.

(3) For transportation by rail, when transmitted by telephone or electronically, the signature must be in one of the following forms: The name of the principal person, partner, officer, or employee of the offeror or his agent in a computer field defined for that purpose.

[Amdt. 172-29A, 41 FR 40677, Sept. 20, 1976]

Editorial Note: For Federal Register citations affecting §172.201, see the List of CFR Sections Affected, which appears in the Finding Aids section of the printed volume and at www.fdsys.gov.

§172.205 Hazardous waste manifest.

(a) No person may offer, transport, transfer, or deliver a hazardous waste (waste) unless an EPA Form 8700-22 and 8700-22A (when necessary) hazardous waste manifest (manifest) is prepared in accordance with 40 CFR 262.20 and is signed, carried, and given as required of that person by this section.

(b) The shipper (generator) shall prepare the manifest in accordance with 40 CFR part 262.

(c) The original copy of the manifest must be dated by, and bear the handwritten signature of, the person representing:

(1) The shipper (generator) of the waste at the time it is offered for transportation; and

(2) The initial carrier accepting the waste for transportation.

(d) A copy of the manifest must be dated by, and bear the handwritten signature of the person representing:

(1) Each subsequent carrier accepting the waste for transportation, at the time of acceptance; and

(2) The designated facility receiving the waste, upon receipt.

(e) A copy of the manifest bearing all required dates and signatures must be:

(1) Given to a person representing each carrier accepting the waste for transportation.

(2) Carried during transportation in the same manner as required by this subchapter for shipping papers.

(3) Given to a person representing the designated facility receiving the waste.

(4) Returned to the shipper (generator) by the carrier that transported the waste from the United States to a foreign destination with a notation of the date of departure from the United States; and

(5) Retained by the shipper (generator) and by the initial and each subsequent carrier for three years from the date the waste was accepted by the initial carrier. Each retained copy must bear all required signatures and dates up to and including those entered by the next person who received the waste.

(f) *Transportation by rail.* Notwithstanding the requirements of paragraphs (d) and (e) of this section, the following requirements apply:

(1) When accepting hazardous waste from a non-rail transporter, the initial rail transporter must:

351

## Hazmat - Visual

Saturday, October 03, 2015
8:26 AM



US Department
Federal Highw
Transp
Admi



# Model Curriculum for Training Tractor-Trailer Drivers

Bureau of Motor Carrier Safety

**1985**

# Instructor's Manual Part Three



US Department
of Transportation
**Federal Highway
Administration**

Visual 21

# *Hazardous Materials Recap*

1. Always Check Your Freight Bills.

2. If You Are Carrying Hazardous Materials—The Bills Must Say So. Bills Must Also Show the Shippers Certification Regarding Classification, Packaging and Labeling.

3. If You Are Transporting Hazardous Materials Your Vehicle Probably Will Require Placards.

4. If Your Vehicle Is Placarded You Must Comply With the Special Requirements of Part 397 of the Federal Motor Carrier Safety Regulations.

5.2-46

## Seal

Saturday, October 03, 2015
8:01 AM

# Model Curriculum for Training Tractor-Trailer Drivers

## Instructor's Manual          Part One




US Department of Transportation
**Federal Highway Administration**

NOTICE

This document is disseminated under the sponsorship of the Department of Transportation in the interest of information exchange. The United States Government assumes no liability for its contents or use thereof. The contents do not necessarily reflect the official policy of the Department of Transportation.  This report does not constitute a standard, specification, or regulation.

The United States Government does not endorse products or manufacturers. Trade or manufacturers' names appear herein only because they are considered essential to the object of this document.

For sale by the Superintendent of Documents, U.S. Government Printing Office  Washington, D.C. 20402

**rural**    Of or characteristic of the country (as opposed to the city).

**saddle tanks**    Barrel type fuel tanks that hang from the sides of the tractor's frame.

**seal**    A security device to assure that truck doors have not been opened in transit.

**secure**    (1) To guard or protect, such as to secure the scene of an accident; (2) to make firm or tight, such as the cargo tie-downs or to secure the truck after parking; (3) to obtain, such as to obtain help; (4) safe and free from danger, such as secure place to stop.

**semi (Slang)**    For either a tractor-trailer combination; or for a semi-trailer.

**semi-trailer**    A trailer that has only rear axles. The front of a semi-trailer either rests on the tractor or is supported by its landing gear when coupled. See full trailer.

**series circuit**    A circuit in which all controls and current con-suming devices are connected in a single line, so that current must pass through each device in sequence. See parallel circuit.

**series-parallel circuit**    A circuit that is made up of combina-tion of series and parallel circuits.

**service (air line)**    See air lines.

**set up**    A freight classification term denoting that an article is put together in its complete state. Not knocked down.

**shipper**    A person or agent that ships freight.

**shipping labels, hazardous**    See Labels D.O.T. HAZARDOUS MATERIALS WARNING.

**shipper's load and count**    Indicates that the contents of a truck were loaded and counted by the shipper and not checked or verified by the transportation line.

**shipper's order**    The document authorizing release of a shipment traveling on an order bill of lading. See bill of lading.

**shipping order**    Instructions to carrier for transportation of a shipment.  Usually it is a copy of the bill of lading. Used also as record by the freight agent at origin.

**shipping papers**    Papers used in connection with movement of freight.

**shipping permit**    Authority issued by a transportation line per-mitting the acceptance and forwarding of goods, against the movement of which, an embargo has been placed.

83

Sealed - Visual

Saturday, October 03, 2015
8:23 AM



US Department
Federal Highw   Transpo
Admi



# Model Curriculum for Training Tractor-Trailer Drivers

Bureau of Motor Carrier Safety

**1985**

# Instructor's Manual Part Three



US Department
of Transportation
**Federal Highway
Administration**

Visual 11

# *Sealed Truck and Bill of Lading Noted "Shippers Weight and Count"*

- If Shipment Loaded and Sealed It Is Checked by Shipper

- Shipper Accepts Responsibility for Weight, Count, and Loading

- Bill of Lading Must Bear Notation:
  "Shippers Weight and Count"

- Serial Numbers of Seals Must Appear on All Three Copies of the Bill of Lading

- Driver Is Still Responsible for Condition of Cargo Enroute and at Delivery

5.2-36

# Shipper - FMCSA

Thursday, October 15, 2015
1:59 PM

Federal Motor Carrier Safety Administration

Published on *Federal Motor Carrier Safety Administration* (http://www.fmcsa.dot.gov)

Home > Regulations > Parts > 392 > § 392.9 > Regulations Section

# Part 392
# DRIVING OF COMMERCIAL MOTOR VEHICLES

- Section
- Guidance

**Question 1: Is a vehicle's cargo compartment considered sealed according to the terms of §392.9(b)(4) when it is secured with a padlock, to which the driver holds a key?**

**Guidance:** No. The driver has ready access to the cargo compartment by using the padlock key and would be required to perform the examinations of the cargo and load-securing devices described in §392.9(b).

**Question 2: Does the Federal Highway Administration (FHWA) have authority to enforce the safe loading requirements against a shipper that is not the motor carrier?**

**Guidance:** No, unless HM as defined in §172.101 are involved. It is the responsibility of the motor carrier and the driver to ensure that any cargo aboard a vehicle is properly loaded and secured.

**Question 3: How may the motor carrier determine safe loading when a shipper has loaded and sealed the trailer?**

**Guidance:** Under these circumstances, a motor carrier may fulfill its responsibilities for proper loading a number of ways. Examples are:

- a. Arrange for supervision of loading to determine compliance; or
- b. Obtain notation on the connecting line freight bill that the lading was properly loaded; or
- c. Obtain approval to break the seal to permit inspection.

**Question 4: Is there a requirement that a driver must personally load, block, brace, and tie down the cargo on the property carrying Commercial Motor Vehicle (CMV) he/she drives?**

**Guidance:** No. But the driver is required to be familiar with methods and procedures for securing cargo, and may have to adjust the cargo or load securing devices pursuant to §392.9(b).

**Disclaimer:**

Although we make every effort to assure that the information we provide is complete and accurate, it is not intended to take the place of published agency regulations. Regulations issued by the U.S. Department of Transportation and its Operating Administrations are published in the Federal Register and compiled in the U.S. Code of Federal Regulations (CFR). Copies of appropriate volumes of the CFR in book format may be purchased from the Superintendent of Documents, U.S. Government Printing Office, or examined at many libraries.

The CFR may also be viewed online at http://ECFR.gpoaccess.gov.

U.S. DEPARTMENT OF TRANSPORTATION

Federal Motor Carrier Safety Administration

1200 NEW JERSEY AVENUE, SE

WASHINGTON, DC 20590

855-368-4200

**Source URL:** http://www.fmcsa.dot.gov/regulations/title49/section/392.9?guidance=

# Shipper - Question 2

Sunday, October 25, 2015
9:35 PM



Friday
April 4, 1997

## Part III

# Department of Transportation

### Federal Highway Administration

**49 CFR Chapter III**
Regulatory Guidance for the Federal
Motor Carrier Safety Regulations; Rule

16369

# DEPARTMENT OF TRANSPORTATION

## Federal Highway Administration

### 49 CFR Chapter III

### Regulatory Guidance for the Federal Motor Carrier Safety Regulations

**AGENCY:** Federal Highway Administration (FHWA), DOT.

**ACTION:** Regulatory guidance.

**SUMMARY:** This document presents interpretive guidance material for the Federal Motor Carrier Safety Regulations (FMCSRs) now contained in the FHWA's Motor Carrier Regulation Information System (MCREGIS). The FHWA has consolidated previously issued interpretations and regulatory guidance materials and developed concise interpretive guidance in question and answer form for each part of the FMCSRs. These questions and answers are generally applicable to drivers, commercial motor vehicles, and motor carrier operations on a national basis. All prior interpretations and regulatory guidance of the FMCSRs issued previously in the **Federal Register**, as well as FHWA memoranda and letters, may no longer be relied upon as authoritative insofar as they are inconsistent with the guidance published today. Many of the interpretations of the FMCSRs published on November 23, 1977, and the interpretations of the Inspection, Repair, and Maintenance regulations published on July 10, 1980, have been revised. These revisions are reflected in the new questions and answers. This document also includes regulatory guidance issued since November 17, 1993, when the agency last published a collection of such guidance. Future regulatory guidance will be issued within the MCREGIS which will be kept current in the FHWA's Office of Motor Carrier Standards. The MCREGIS will be updated periodically and published in the **Federal Register** so that interested parties may have ready reference to official interpretations and guidance regarding the FMCSRs. This guidance will provide the motor carrier industry with a clearer understanding of the applicability of many of the requirements contained in the FMCSRs in particular situations.

**EFFECTIVE DATE:** May 4, 1997.

**FOR FURTHER INFORMATION CONTACT:** Mr. Neill L. Thomas or Mr. Nathan C. Root, Office of Motor Carrier Standards, (202) 366–1790, or Mr. Charles E. Medalen, Office of the Chief Counsel, (202) 366–1354, Federal Highway Administration, Department of Transportation, 400 Seventh Street, SW., Washington, DC

20590. Office hours are from 7:45 a.m. to 4:15 p.m., e.t., Monday through Friday, except Federal legal holidays.

**SUPPLEMENTARY INFORMATION:** This document is an update of the notice of regulatory guidance for the FMCSRs issued by the FHWA November 17, 1993 (58 FR 60734). This notice contains previously issued, received, and new regulatory guidance pertaining to Title 49, Code of Federal Regulations (CFR), Parts 40, 325, 382, 383, 384, 386, 387, 390 to 393, 395 to 397, and 399 of the FMCSRs. In some instances, old regulatory guidance has been removed. The information published in this document supersedes all previously issued interpretations and regulatory guidance, to the extent they are inconsistent with the guidance published today, including that published on November 23, 1977, at 42 FR 60078, and on July 10, 1980, at 45 FR 46425. To the maximum extent possible, all valid prior opinions have been incorporated into this document. This notice is consistent with the Small Business Regulatory Enforcement Fairness Act of 1996 (Pub. L. 104–121, March 29, 1996).

The FHWA issued a final rule on March 8, 1996, which codified most of the regulatory guidance for CDL waivers under § 383.3 (61 FR 9546). Guidance concerning CDL waivers had been issued under the 1993 Regulatory Guidance notice for § 383.7. From the 1993 Regulatory Guidance notice for § 383.7, only questions 7(a), 8, 9, 10, 16, 17, 21, and 22 still remain. These questions and guidance are now listed as guidance for § 383.3, where the CDL waivers have been codified.

Guidance for question 3 under § 383.5 has been changed to reflect a more expansive version of the same guidance in existence prior to the November 1993 Notice. Guidance for question 2 under § 383.93, as it appeared in the 1993 notice, has been revised to clarify the existing guidance. Guidance for question 1 under § 390.31 has been expanded to include guidance derived from a Final Order issued by the Department (58 FR 62467). Guidance for question 1 of § 391.1 has been changed to remove a reference to part 391 subpart H. Guidance for question 6 under § 391.11 has been moved to § 392.9. Guidance for question 2 under § 391.27 has been removed; violations of size and weight laws are not considered violations of motor vehicle traffic laws. Question 1 for § 391.41 has been changed for clarity. Guidance for question 1 under § 391.43 has been expanded for greater clarity. Guidance for § 392.62 has been moved to § 391.41. Guidance for question 1 of § 393.51, question 1 of § 393.65, question 1 of

§ 393.75, question 5 of § 393.100, and question 1 of § 393.106 have been amended for clarity. Guidance for question 1 under § 393.95 has been incorporated into the regulations (58 FR 34708) and is therefore removed from this document. Guidance for § 395.1 has been reordered to consecutively follow the paragraphs within the section. Question 15 under § 395.2 was expanded by guidance issued June 11, 1995. Question 20 under § 395.2 has been revised to reflect an interpretation previously issued August 15, 1991, treating the same issue in a more explicit manner. Question 1 under § 397.1 has been changed to more accurately explain who must comply with part 397. The 1994 Regulatory Guidance booklet, which reprinted the interpretations issued in the **Federal Register** in 1993, is available in the public docket on this rulemaking for reference.

The FHWA issued an advance notice of proposed rulemaking on November 5, 1996 (61 FR 57252) concerning the hours of service regulations (49 CFR part 395). On page 57258 of the notice, the FHWA erroneously indicated that an interpretation which allowed CMVs to be driven from motels to restaurants in the vicinity as "off duty time" had recently been rescinded. The FHWA intended to rescind *recent* interpretations that describe conditions under which a CMV may be used as a "personal conveyance" (issued August 10, 1995), and address the entire issue of personal conveyance through notice and comment rulemaking. Question 8 under § 395.2 has been expanded by guidance issued November 18, 1996, and placed more appropriately under § 395.8 (see § 395.8, question 27). All prior interpretations of personal conveyance are invalid.

Since 1993, new interpretive guidance has been issued for, or existing guidance has been removed from, the following sections:

49 CFR Part 40 §§ 40.3, 40.21, 40.23, 40.25, 10.29, 40.31, 40.33, 40.35, 40.39, 40.69, 40.81, 40.93, Special Topics—Requirements for Random Testing, Special Topics Procedures for Handling and Processing a Split Specimen

49 CFR Part 382 §§ 382.103, 382.105, 382.107, 382.109, 382.113, 382.115, 382.201, 382.205, 382.213, 382.301, 382.303, 382.305, 382.307, 382.401, 382.403, 382.405, 382.413, 382.501, 382.507, 382.601, 382.603, 382.605, Subpart B - Prohibitions, Special Topics - Responsibility for Payment for Testing, Special Topics -

**16370**    Federal Register / Vol. 62, No. 65 / Friday, April 4, 1997 / Rules and Regulations

## DEPARTMENT OF TRANSPORTATION

### Federal Highway Administration

### 49 CFR Chapter III

### Regulatory Guidance for the Federal Motor Carrier Safety Regulations

**AGENCY:** Federal Highway Administration (FHWA), DOT.

**ACTION:** Regulatory guidance.

**SUMMARY:** This document presents interpretive guidance material for the Federal Motor Carrier Safety Regulations (FMCSRs) now contained in the FHWA's Motor Carrier Regulation Information System (MCREGIS). The FHWA has consolidated previously issued interpretations and regulatory guidance materials and developed concise interpretive guidance in question and answer form for each part of the FMCSRs. These questions and answers are generally applicable to drivers, commercial motor vehicles, and motor carrier operations on a national basis. All prior interpretations and regulatory guidance of the FMCSRs issued previously in the Federal Register, as well as FHWA memoranda and letters, may no longer be relied upon as authoritative insofar as they are inconsistent with the guidance published today. Many of the interpretations of the FMCSRs published on November 23, 1977, and the interpretations of the Inspection, Repair, and Maintenance regulations published on July 10, 1980, have been revised. These revisions are reflected in the new questions and answers. This document also includes regulatory guidance issued since November 17, 1993, when the agency last published a collection of such guidance. Future regulatory guidance will be issued within the MCREGIS which will be kept current in the FHWA's Office of Motor Carrier Standards. The MCREGIS will be updated periodically and published in the Federal Register so that interested parties may have ready reference to official interpretations and guidance regarding the FMCSRs. This guidance will provide the motor carrier industry with a clearer understanding of the applicability of many of the requirements contained in the FMCSRs in particular situations.

**EFFECTIVE DATE:** May 4, 1997.

**FOR FURTHER INFORMATION CONTACT:** Mr. Neill L. Thomas or Mr. Nathan C. Root, Office of Motor Carrier Standards, (202) 366–1790, or Mr. Charles E. Medalen, Office of the Chief Counsel, (202) 366–1354, Federal Highway Administration, Department of Transportation, 400 Seventh Street, SW., Washington, DC

20590. Office hours are from 7:45 a.m. to 4:15 p.m., e.t., Monday through Friday, except Federal legal holidays.

**SUPPLEMENTARY INFORMATION:** This document is an update of the notice of regulatory guidance for the FMCSRs issued by the FHWA November 17, 1993 (58 FR 60734). This notice contains previously issued, however, and new regulatory guidance pertaining to Title 49, Code of Federal Regulations (CFR), Parts 40, 325, 382, 383, 384, 386, 387, 390 to 393, 395 to 397, and 399 of the FMCSRs. In some instances, old regulatory guidance has been removed. The information published in this document supersedes all previously issued interpretations and regulatory guidance, to the extent they are inconsistent with the guidance published today, including that published on November 23, 1977, at 42 FR 60078, and on July 10, 1980, at 45 FR 46425. To the maximum extent possible, all valid prior opinions have been incorporated into this document. This notice is consistent with the Small Business Regulatory Enforcement Fairness Act of 1996 (Pub. L. 104–121, March 29, 1996).

The FHWA issued a final rule on March 8, 1996, which codified most of the regulatory guidance for CDL waivers under § 383.3 (61 FR 9548). Guidance concerning CDL waivers had been issued under § 383.7. From the 1993 Regulatory Guidance notice for § 383.7, only questions 7(a), 8, 9, 10, 16, 17, 21, and 22 still remain. These questions and guidance are now listed as guidance for § 383.3, where the CDL waivers have been codified.

Guidance for question 3 under § 383.5 has been changed to reflect a more expansive version of the same guidance in existence prior to the November 1993 Notice. Guidance for question 2 under § 383.93, as it appeared in the 1993 notice, has been revised to clarify the existing guidance. Guidance for question 1 under § 390.31 has been expanded to include guidance derived from a Final Order issued by the Department (58 FR 62467). Guidance for question 1 of § 391.1 has been changed to remove a reference to part 391 subpart H. Guidance for question 6 under § 391.11 has been moved to § 392.9. Guidance for question 2 under § 391.27 has been removed: violations of size and weight laws are not considered violations of motor vehicle traffic laws. Question 1 for § 391.41 has been changed for clarity. Guidance for question 1 under § 391.43 has been expanded for greater clarity. Guidance for § 392.62 has been moved to § 391.41. Guidance for question 1 of § 393.51, question 1 of § 393.65, question 1 of

§ 393.75, question 5 of § 393.100, and question 1 of § 393.106 have been amended for clarity. Guidance for question 1 under § 393.95 has been incorporated into the regulations (58 FR 34708) and is therefore removed from this document. Guidance for § 395.1 has been reordered to consecutively follow the paragraphs within the section. Question 15 under § 395.2 was expanded by guidance issued June 11, 1995. Question 20 under § 395.2 has been revised to reflect an interpretation previously issued August 15, 1991, treating the same issue in a more explicit manner. Question 1 under § 397.1 has been changed to more accurately explain who must comply with part 397. The 1994 Regulatory Guidance booklet, which reprinted the interpretations issued in the Federal Register in 1993, is available in the public docket on this rulemaking for reference.

The FHWA issued an advance notice of proposed rulemaking on November 5, 1996 (61 FR 57252) concerning the hours of service regulations (49 CFR part 395). On page 57258 of the notice, the FHWA erroneously indicated that an interpretation which allowed CMVs to be driven from motels to restaurants in the vicinity as "off duty time" had recently been rescinded. The FHWA intended to rescind *recent* interpretations that describe conditions under which a CMV may be used as a "personal conveyance" (issued August 10, 1995), and address the entire issue of personal conveyance through notice and comment rulemaking. Question 8 under § 395.2 has been expanded by guidance issued November 18, 1996, and placed more appropriately under § 395.8 (see § 395.8, question 27). All prior interpretations of personal conveyance are invalid.

Since 1993, new interpretive guidance has been issued for, or existing guidance has been removed from, the following sections:

49 CFR Part 40 §§ 40.3, 40.21, 40.23, 40.25, 40.29, 40.31, 40.33, 40.35, 40.39, 40.69, 40.81, 40.93. Special Topics – Requirements for Random Testing, Special Topics-Procedures for Handling and Processing a Split Specimen.

49 CFR Part 382 §§ 382.103, 382.105, 382.107, 382.109, 382.113, 382.115, 382.204, 382.205, 382.213, 382.301, 382.303, 382.305, 382.307, 382.401, 382.403, 382.405, 382.413, 382.501, 382.507, 382.601, 382.603, 382.605. Subpart B – Prohibitions. Special Topics – Responsibility for Payment for Testing. Special Topics

Multiple Service Providers, Special Topics—Medical Examiners Acting as MRO, Special Topics—Biennial (Periodic) Testing Requirements

49 CFR Part 383 §§383.3, 383.5, 383.7, 383.31, 383.71, 383.73, 383.91, 383.93, Special Topics—International

49 CFR Part 384 §§384.209, 384.211

49 CFR Part 387 §§387.9, 387.15, 387.39

49 CFR Part 390 §§390.3, 390.5, 390.15, Special Topics—Serious Pattern of Violations

49 CFR Part 391 §§391.1, 391.11, 391.27, 391.41, 391.43, 391.49, 391.51, 391.63

49 CFR Part 392 §§392.5, 392.9, 392.62

49 CFR Part 393 §§393.11, 393.42, 393.48, 393.51, 393.65, 393.75, 393.89, 393.95, 393.100, 393.106, 393.201

49 CFR Part 395 §§395.1, 395.2, 395.8, 395.13, 395.15

49 CFR Part 396 §§396.11, 396.17, 396.23

Additional guidance will continue to be published in future issues of the **Federal Register**. The FHWA will be modifying or removing numerous regulations as part of President Clinton's Regulatory Reform Initiative. Many of these changes will have an impact on the regulatory guidance in this document. These changes will be reflected in future issues of the **Federal Register**. Members of the motor carrier industry and other interested parties may access the guidance in this document through the FHWA's Electronic Bulletin Board System (FEBBS) using a microcomputer and modem. The FEBBS is a read only facility. Access numbers for FEBBS are (202) 366-3764 for the Washington, DC area, or toll free at (800) 337-3492. The system supports a variety of modem speeds up to 14,400 baud line speeds, and a variety of terminal types and protocols. Modems should be set to 8 data bits, full duplex, and no parity for optimal performance. Once a connection has been established, new users will have to go through a registration process. Instructions are given on the screen. FEBBS is mostly menu-drive and hot keys are indicated with "< >" enclosing the hot key. After logging on to FEBBS and arriving at the MAIN MENU, select <C> for Conference; then <M> for Motor Carrier; then either <M> again for MCREGIS Questions and Answers, or <I> for Information (more detailed help).

For Technical Assistance to gain access to FEBBS, contact: FHWA Computer Help Desk, HMS-40, room 4401, 400 Seventh Street, SW, Washington, DC 20590 (202) 366-1120.

Specific questions addressing any of the interpretive material published in this document may be directed to the contact persons listed above, the FHWA Regional Offices, or the FHWA Division Office in each State.

For ease of reference, the following listing of acronyms used throughout this document is provided:

Appendix G—The Minimum Periodic Inspection Standards published as an appendix to the Federal Motor Carrier Safety Regulations

BAT—Breath Alcohol Technician

CDL—Commercial Driver's License

CDLIS—Commercial Driver's License Information System

CFR—Code of Federal Regulations

CMV—Commercial Motor Vehicle

CMVSA—Commercial Motor Vehicle Safety Act of 1986

COE—Cab-over-engine truck tractor

C/TPA—Consortium or Third Party Administrator

CVSA—Commercial Vehicle Safety Alliance

DHHS-SAMHSA—Department of Health and Human Services, Substance Abuse Mental Health Services Administration

DOT—U.S. Department of Transportation

DVIR—Driver Vehicle Inspection Report

DWI—Driving While Intoxicated

EAP—Employee Assistance Program

EPA—U.S. Environmental Protection Agency

FHWA—Federal Highway Administration

FMCSRs—Federal Motor Carrier Safety Regulations

FMVSS—Federal Motor Vehicle Safety Standards (developed and issued by the National Highway Traffic Safety Administration)

FR—Federal Register

FRSI—Farm-Related Service Industries

GCWR—Gross Combination Weight Rating

GVW—Gross Vehicle Weight

GVWR—Gross Vehicle Weight Rating

HM—Hazardous Materials

HMRs—Hazardous Materials Regulations

HMTUSA—Hazardous Materials Transportation Uniform Safety Act of 1990

ICC—Interstate Commerce Commission

Forms MCS 90 and MCS 90B Endorsements for Motor Carrier Policies of Insurance for Public Liability Under Sections 29 and 30 of the Motor Carrier Act of 1980 issued by an Insurer

MCSA—Motor Carrier Safety Act of 1984

MPH—Miles Per Hour

MRO—Medical Review Officer

NDR—National Driver Register

NHTSA—National Highway Traffic Safety Administration within DOT

RDMC—Regional Director of Motor Carriers

SAP—Substance Abuse Professional

SSN—Social Security Number

STAA—Surface Transportation Assistance Act of 1982

STT—Screening Test Technician

U.S.C.—United States Code

## Table of Contents

Part 40—Procedures for Transportation Workplace Drug and Alcohol Testing Programs

Part 325—Compliance With Interstate Motor Carrier Noise Emission Standards

Part 382—Controlled Substances and Alcohol Use and Testing

Part 383—Commercial Driver's License Standards: Requirements and Penalties

Part 384—State Compliance With Commercial Driver's License Program

Part 386—Rules of Practice for Motor Carrier Safety and Hazardous Materials Proceedings

Part 387—Minimum Levels of Financial Responsibility for Motor Carriers

Part 390—Federal Motor Carrier Safety Regulations, General

Part 391—Qualifications of Drivers

Part 392—Driving of Motor Vehicles

Part 393—Parts and Accessories Necessary for Safe Operation

Part 395—Hours of Service of Drivers

Part 396—Inspection, Repair and Maintenance

Part 397—Transportation of Hazardous Materials, Driving and Parking Rules

Part 399—Employee Safety and Health Standards

**Regulatory Guidance**

**Part 40—Procedures for Transportation Workplace Drug and Alcohol Testing Programs**

Sections Interpreted

40.3   Definitions
40.21   The Drugs
40.23   Preparation for testing
40.25   Specimen collection procedures
40.29   Laboratory analysis procedures
40.31   Quality assurance and quality control
40.33   Reporting and review of results
40.55   Protection of employee records
40.59   Use Of DHHS certified laboratories
40.69   Inability to provide an adequate amount of breath
40.81   Availability and disclosure of alcohol testing information about individual employees
40.93   The screening test technician
Special Topics—Requirements for random testing
Special Topics—Procedures for Handling and Processing a Split Specimen

*Section 40.3   Definitions*

*Question 1:* May a Doctor of Chiropractic, holding a Certified Addiction Professional degree, serve as an MRO?

*Guidance:* A Doctor of Chiropractic, holding a Certified Addiction Professional degree, is not considered to be a licensed medical doctor or doctor of osteopathy and, therefore, cannot serve as an MRO.

*Question 2:* What are the qualifications and responsibilities of the MRO? Are MROs required to be certified?

*Guidance:* Section 40.3 defines the qualifications for an MRO and § 40.33 specifies the MRO's responsibilities. An MRO is defined as a licensed physician (medical doctor or doctor of osteopathy) responsible for receiving laboratory

be incorporated into another carrier's forms such as a lease and/or interchange agreement?

*Guidance:* Yes. However, the certificate of qualification must be signed and dated by an officer or authorized employee of the regularly employing carrier.

*Question 3:* Is a motor carrier required to accept a certificate from the driver's regularly employing motor carrier certifying that the driver is qualified per § 391.65?

*Guidance:* No. If the motor carrier chooses not to accept the certificate issued by the regularly employing motor carrier furnishing the driver, the motor carrier must then assume responsibility for assuring itself that the driver is fully qualified in accordance with part 391.

*Question 4:* If a driver furnished by another motor carrier is in the second carrier's service for a period of 7 consecutive days or more, may the driver still fall under the exemption in § 391.65?

*Guidance:* No. The driver becomes a regularly employed driver of the second motor carrier and the exemption in § 391.65 is inapplicable.

## PART 392—DRIVING OF MOTOR VEHICLES

Sections Interpreted

392.3   Ill or Fatigued Operator
392.5   Intoxicating Beverage
392.6   Schedules To Conform With Speed Limits
392.7   Equipment, Inspection, and Use
392.9   Safe Loading
392.14  Hazardous Conditions; Extreme Caution
392.16  Use of Seat Belts
392.42  Notification of License Revocation
392.60  Unauthorized Persons Not To Be Transported

### Section 392.3   Ill or Fatigued Operator

*Question 1:* What protection is afforded a driver for refusing to violate the FMCSRs?

*Guidance:* Section 405 of the STAA (49 U.S.C. 31105) states, in part, that no person shall discharge, discipline, or in any manner discriminate against an employee with respect to the employee's compensation, terms, conditions, or privileges of employment for refusing to operate a vehicle when such operation constitutes a violation of any Federal rule, regulation, standard, or order applicable to CMV safety. In such a case, a driver may submit a signed complaint to the Occupational Safety and Health Administration.

### Section 392.5   Intoxicating Beverage

*Question 1:* Do possession and use of alcoholic beverages in the passenger area of a motorcoach constitute "possession" of such beverages under § 392.5(a)(3)?

*Guidance:* No.

*Question 2:* Can a motor carrier, which finds a driver with a detectable presence of alcohol, place him/her out of service in accordance with § 392.5?

*Guidance:* No. The term "out of service" in the context of § 392.5 refers to an act by a State or Federal official. However, the motor carrier must prevent the driver from being on duty or from operating or being in physical control of a CMV for at least as long as is necessary to prevent a violation of § 392.5.

*Question 3:* Does the prohibition against carrying alcoholic beverages in § 392.5 apply to a driver who uses a company vehicle, for personal reasons, while off-duty?

*Guidance:* No. For example, an owner-operator using his/her own vehicle in an off-duty status, or a driver using a company truck or tractor for transportation to a motel, restaurant, or home, would normally be outside the scope of this section.

*Question 4:* Would an alcohol test, performed by an employer pursuant to 49 CFR part 382, with a result greater than 0.00 BAC, but less than 0.02 BAC, establish that a driver was in violation of 49 CFR 392.5(a)(2), having any measured alcohol concentration while on duty?

*Guidance:* No. The FHWA believes that a 0.02 BAC is the lowest level at which a scientifically accurate breath/blood alcohol concentration can be measured in an employer-based test under part 382. The FHWA further believes that this use of a 0.02 BAC standard is consistent with FHWA's long established zero tolerance standard for alcohol. This guidance in no way impedes or precludes any action taken by a law enforcement official because of a finding that a BAC level was less than 0.02 BAC.

### Section 392.6   Schedules to Conform With Speed Limits.

*Question 1:* How many miles may a driver record on his/her daily record of duty status and still be presumed to be in compliance with the speed limits?

*Guidance:* Drivers are required to conform to the posted speed limits prescribed by the jurisdictions in or through which the vehicle is being operated. Where the total trip is on highways with a speed limit of 65 mph, trips of 550–600 miles completed in 10 hours are considered questionable and the motor carrier may be asked to document that such trips can be made. Trips of 600 miles or more will be assumed to be incapable of being completed without violations of the speed limits and may be required to be

documented. In areas where a 55 mph speed limit is in effect, trips of 450–500 miles are open to question, and runs of 500 miles or more are considered incapable of being made in compliance with the speed limit and hours of service limitation.

### Section 392.7   Equipment, Inspection, and Use

*Question 1:* Must a driver prepare a written report of a pretrip inspection performed under § 392.7?

*Guidance:* No.

*Question 2:* Must both drivers of a team operation comply with the provisions of § 392.7 before driving?

*Guidance:* Section 392.7 states that a driver must be satisfied that the vehicle is in good working order before operating the vehicle. If a driver is satisfied with a co-driver's inspection, or a safety lane inspection, then the requirement of this section will have been met.

### Section 392.9   Safe Loading

*Question 1:* Is a vehicle's cargo compartment considered sealed according to the terms of § 392.9(b)(4) when it is secured with a padlock, to which the driver holds a key?

*Guidance:* No. The driver has ready access to the cargo compartment by using the padlock key and would be required to perform the examinations of the cargo and load-securing devices described in § 392.9(b).

*Question 2:* Does the FHWA have authority to enforce the safe loading requirements against a shipper that is not the motor carrier?

*Guidance:* No, unless HM as defined in § 172.101 are involved. It is the responsibility of the motor carrier and the driver to ensure that any cargo aboard a vehicle is properly loaded and secured.

*Question 3:* How may the motor carrier determine safe loading when a shipper has loaded and sealed the trailer?

*Guidance:* Under these circumstances, a motor carrier may fulfill its responsibilities for proper loading a number of ways. Examples are: a. Arrange for supervision of loading to determine compliance; or

b. Obtain notation on the connecting line freight bill that the lading was properly loaded; or

c. Obtain approval to break the seal to permit inspection.

*Question 4:* Is there a requirement that a driver must personally load, block, brace, and tie down the cargo on the property carrying CMV he/she drives?

*Guidance:* No. But the driver is required to be familiar with methods and procedures for securing cargo, and

# Shipper Certification

Thursday, October 01, 2015
1:34 PM

## ELECTRONIC CODE OF FEDERAL REGULATIONS

### e-CFR data is current as of September 29, 2015

Title 49 → Subtitle B → Chapter I → Subchapter C → Part 172 → Subpart C → §172.204

Title 49: Transportation
PART 172—HAZARDOUS MATERIALS TABLE, SPECIAL PROVISIONS, HAZARDOUS MATERIALS
COMMUNICATIONS, EMERGENCY RESPONSE INFORMATION, TRAINING REQUIREMENTS, AND SECURITY
PLANS
Subpart C—Shipping Papers

### §172.204  Shipper's certification.

(a) *General*. Except as provided in paragraphs (b) and (c) of this section, each person who offers a hazardous material for transportation shall certify that the material is offered for transportation in accordance with this subchapter by printing (manually or mechanically) on the required shipping paper containing the required shipping description the certification contained in paragraph (a)(1) of this section or the certification (declaration) containing the language contained in paragraph (a)(2) of this section. For transportation by rail only, the certification may be received verbally or with an electronic signature in conformance with paragraphs (a)(3)(i) and (a)(3)(ii) of this section.

(1) "This is to certify that the above-named materials are properly classified, described, packaged, marked and labeled, and are in proper condition for transportation according to the applicable regulations of the Department of Transportation."

NOTE: In line one of the certification the words "herein-named" may be substituted for the words "above-named".

(2) "I hereby declare that the contents of this consignment are fully and accurately described above by the proper shipping name, and are classified, packaged, marked and labeled/placarded, and are in all respects in proper condition for transport according to applicable international and national governmental regulations."

NOTE TO PARAGRAPH (a)(2): In the certification the word "above" may be substituted for the word "below" as appropriate.

(3) *Rail only certifications*. For transportation by rail, the shipping paper certification may also be accomplished by one of the following methods:

(i) *Verbal Certification*. When received telephonically, by the carrier reading the complete shipping description that will accompany the shipment back to the offeror and receiving verbal acknowledgment that the description is as required. This verbal acknowledgement must be recorded, either on the shipping document or in a separate record, e.g., the waybill, in accordance with §174.24, and must include the date and name of the person who provided this information; or

(ii) *Electronic Signature Certification*. When transmitted electronically, by completing the field designated for the shipper's signature, the shipper is also certifying its compliance with the certification specified in §172.204(a)." The name of the principal partner, officer, or employee of the offeror or their agent must be substituted for the asterisks;

(b) *Exceptions*. (1) Except for a hazardous waste, no certification is required for a hazardous material offered for transportation by motor vehicle and transported:

(i) In a cargo tank supplied by the carrier, or

(ii) By the shipper as a private carrier except for a hazardous material that is to be reshipped or transferred from one carrier to another.

(2) No certification is required for the return of an empty tank car which previously contained a hazardous material and which has not been cleaned or purged.

(c) *Transportation by air*—(1) *General*. Certification containing the following language may be used in place of the certification required by paragraph (a) of this section:

I hereby certify that the contents of this consignment are fully and accurately described above by proper shipping name and are classified, packaged, marked and labeled, and in proper condition for carriage by air according to applicable national governmental regulations.

NOTE TO PARAGRAPH (c)(1): In the certification, the word "packed" may be used instead of the word "packaged" until October 1, 2010.

(2) *Certificate in duplicate.* Each person who offers a hazardous material to an aircraft operator for transportation by air shall provide two copies of the certification required in this section. (See §175.30 of this subchapter.)

(3) *Additional certification requirements.* Effective October 1, 2006, each person who offers a hazardous material for transportation by air must add to the certification required in this section the following statement:

"I declare that all of the applicable air transport requirements have been met."

(i) Each person who offers any package or overpack of hazardous materials for transport by air must ensure that:

(A) The articles or substances are not prohibited for transport by air (see the §172.101 Table);

(B) The articles or substances are properly classed, marked and labeled and otherwise in a condition for transport as required by this subchapter;

(C) The articles or substances are packaged in accordance with all the applicable air transport requirements, including appropriate types of packaging that conform to the packing requirements and the "A" Special Provisions in §172.102; inner packaging and maximum quantity per package limits; the compatibility requirements (see, for example, §173.24 of this subchapter); and requirements for closure for both inner and outer packagings, absorbent materials, and pressure differential in §173.27 of this subchapter. Other requirements may also apply. For example, single packagings may be prohibited, inner packaging may need to be packed in intermediate packagings, and certain materials may be required to be transported in packagings meeting a more stringent performance level.

(ii) [Reserved]

(4) *Radioactive material.* Each person who offers any radioactive material for transportation aboard a passenger-carrying aircraft shall sign (mechanically or manually) a printed certificate stating that the shipment contains radioactive material intended for use in, or incident to, research, or medical diagnosis or treatment.

(d) *Signature.* The certifications required by paragraph (a) or (c) of this section:

(1) Must be legibly signed by a principal, officer, partner, or employee of the shipper or his agent; and

(2) May be legibly signed manually, by typewriter, or by other mechanical means.

(3) For transportation by rail, when transmitted by telephone or electronically, the signature must be in one of the following forms: The name of the principal person, partner, officer, or employee of the offeror or his agent in a computer field defined for that purpose.

[Amdt. 172-29A, 41 FR 40677, Sept. 20, 1976]

EDITORIAL NOTE: For FEDERAL REGISTER citations affecting §172.204, see the List of CFR Sections Affected, which appears in the Finding Aids section of the printed volume and at *www.fdsys.gov.*

Need assistance?

# EXHIBIT "D"

# Robert R. Reed

4475 Beacon Hill Road
Columbus, Ohio 43228
**Phone** (614) 853 – 0340

## EMPLOYMENT

4/13

*August 2004 – Present*

### Reed Transportation Service Inc. Columbus, Ohio

Consulting and training services for maintenance, operation, performance, safety and
regulations/standards involving commercial vehicles, construction and specialized
equipment, hazardous materials transportation, investigation/analysis of crashes,
inspection of equipment, third – party review, training and assistance.

*July 2001 – November 2005*

### Maintenance Shop Foreman, Pro-Terra Environmental Contracting, Co. Columbus, Ohio

Develop and implement maintenance programs, supervise, manage, and perform
maintenance for trucks, trailers, construction and off-road equipment. Comply with DOT
& OSHA regulations/records, safety, and cost containment. Provided truck driver and
equipment operator training. Drive trucks and deliver equipment to jobsites as needed.
Oversize loads, flatbed trailers, tanker trucks and trailers and bulk containers. Hazardous
materials and hazardous waste transportation. Received & performed mandated OSHA
1926 training.

*September 2000 – July 2001*

### Vehicle Maintenance Supervisor, Rumpke Transportation Columbus, Ohio

Manage and supervise garage employees repairing trucks, tractors, trailers, and
specialized equipment used in the refuse and recycling industry. Comply with DOT
records, safety and cost containment. Perform warranty work and claims.

*June 2000 – September 2000*

### Transportation Consultant Columbus, Ohio

*September 1999 – June 2000*

### Terminal Manager, Amstan Logistics Columbus, Ohio

Open and manage regional operation for an international manufacturer. Secure outbound
and inbound freight, supervise operations, dispatch, driver recruitment and retention,
customer relations, maintenance, safety, and hiring of terminal.

*August 1997 – September 1999*

### Director/Terminal Manager, Pro Transportation, Inc. Columbus, Ohio

New start-up operation for a national carrier. Secure outbound and inbound freight,
supervise operations, dispatch, driver recruitment and retention, customer relations,
maintenance, safety, hiring, profitability, and growth of the 38 truck fleet.

*January 1995 – August 1997*

> *Terminal Manager, Continental Express Inc.*
> *Columbus, Ohio*
> Manage regional terminal for a national carrier. Increased from 18 drivers to 44 drivers.
> Secure outbound and inbound freight, supervise operations, dispatch, driver recruitment
> and retention, customer relations, maintenance, safety, and hiring of terminal.

*1993 – 1995*

> *General Manager, Eagle Freight Express, Inc. Romito Corporation*
> *Columbus, Ohio*
> New start-up company 2 to 35 driver operation. Supervise operations, dispatch, driver
> recruitment and retention, customer relations, maintenance, set policy
> and procedures, open new terminals.

*1991 – 1993*

> *Safety and Maintenance Director, Seminole Intermodal Transport, Romito*
> *Corporation. Columbus, Ohio*
> Develop and supervise operations of five companies consisting of 135 tractors and 380
> trailers. Control parts purchases, cost containment, driver training, accident investigation,
> tractor and trailer specs, preventive maintenance, breakdown/accident analysis, claims
> and compliance for DOT, EPA, OSHA, and labor relations.

*1988 – 1991*

> *Industrial Training Coordinator/Instructor, Belmont-Harrison Vocational*
> *School. St. Clairsville, Ohio*
> Develop curriculum, manage, and teach all phases of diesel mechanics and truck safety
> courses, work with employers and public relations. Conduct safety meetings for drivers
> and employees of the trucking industry. Develop, supervise and teach statewide
> "CDL" training classes for hundreds of drivers to educate on the written and road tests.
> Received training and also taught OSHA and MSHA regulations safety classes.
> Conducted "CDL" third party road tests 1990-1992. State teaching certificates: Truck
> Driver Training, Diesel Mechanics, and Diversified Industrial Training 1988 - 1992

*1979 – 1988*

> *Diesel Mechanic/Terminal Manager, National Tank Truck Delivery*
> *Shadyside, Ohio*
> Responsible for maintenance of tractors and trailers in over the road operations, manage
> shop, purchasing, DOT compliance and records. Last 16 months promoted to terminal.
> manager for all operations, supervise drivers, schedule dispatch, perform recordkeeping,
> time sheets and payroll. Set policy, procedures, and routing for drivers and safety.

*1972 – 1979*

> *Fleet Mechanic, City of Wheeling, West Virginia*
> Maintenance, repair and inspection of city vehicles, cars, trucks, trailers, tractors, loaders,
> backhoes, bulldozers, air compressors, and specialized equipment. Welding, brazing, and
> fabrication of metal. Certified WV State Inspector – Fleet Vehicles

*1968 – 1972*

> *Alignment/Brake Mechanic, Wheeling Tire Center, Wheeling, WV*
> Align cars and trucks, front-end, steering, brake repairs, install lift kits and springs,
> change rear-ends, car, truck, and industrial tires and recap tires. Worked part-time
> until 1982.

*1967 -1968*

> *Mechanic/Wrecker Driver, McGrath's Esso Service Station, Wheeling, WV*
> Service Station mechanical repairs, operated wreckers for AAA road service, accidents
> and breakdown of cars and trucks, worked part-time through 1972

## EDUCATION

**Bridgeport High School**
Bridgeport, Ohio

**American Technical Institute**
Cleveland, Ohio
1 year – Mechanical Drawing

**General Motors Training Center**
Pittsburgh, PA
Diesel/Gas Engines, Air Brakes

**Ohio Division of Safety and Hygiene**
1. Teaching the Safe Operation of Industrial Trucks
   November 28, 29, 1989 –OSHA Regulations
2. Accident Investigation – Root Cause & Prevention
   November 7, 8, 1990
3. Hazardous Waste and Emergency Response
   June 18, 19, 1991 DOT Hazmat & EPA Regulations

**Ohio Department of Highway Safety**
56 clock hour's CDL Examiner Training
Commercial Driver License Standards/Regulations
Examiner # 7875  12/30/89

**U.S. Department of Labor**
Mine Safety and Health Administration
MSHA Training & Instructor Card 12/90

**Ohio Department of Education**
Vocational Instructor - Proper Training &Curriculum
In-service training 1988-1991

**Motion Control Industries/Carlisle Brakes**
Air Brake Technical Training/DOT
December 19, 1991

**Liberty Mutual Insurance**
Decision Driving Course for Driver Trainers
DOT Regulations/Driver Safety Standards
February 19, 20, 21, 1992

**John Deere Insurance,** June 1995
1995 Compliance Drug & Alcohol Abuse
DOT Regulations

**Business Medical Services**  2/23/96
Supervisor Training – Drug & Alcohol Abuse

**North American Transportation Institute**
Motor Fleet Accident Investigation Feb. 15, 16, 17, 2005
**NAPARS – "Crash Investigation & Reconstruction Update 2005"**
OSHP – Academy – Columbus, Ohio June 27, 28, 2005

**Association of Equipment Management Professionals**
1. Excavator Trouble Shooting Training
   October 12, 2002
2. Hydraulic Hoe Ram Safety, Maintenance,
   & Operation – October 12, 2002

Wheel End Maintenance
Seal Installation and Wheel Bearing Adjustment
**Chicago Rawhide April 30, 2001**

**Charles Management Inc.**
OSHA 29CFR 1910.177
Servicing Truck Rims, Tires, and Wheels
January 30, 2003

**Builders Exchange of Central Ohio**
DOT & PUCO Regulations
January 29, 2003

**BP/Global Alliance Safety Training**
12 - 2003 & 11 - 2004

**SafeX Training**
1. Drug-Free Workplace Employee Education
   September 6, 2003
2. Drug-Free Workplace Supervisor Education
   September 6, 2003
3. Health, Safety, and Environmental Training
   40 hr. Hazardous Waste Operations
   DOT Hazmat, EPA & 29CFR 1910.120
   Regulations -  January 25-29, 2004

**American Red Cross**
Standard First Aid and Adult CPR
February 27, 2004

**National Safety Council**
Defensive Driving Instructor 1990-1997
Course Completion Date Jan. 1990
Ohio Traffic School Remedial Training Instructor

**Over 25 Year ASE Certified
Medium / Heavy Truck Technician**
*Certified thru 2017 in Gasoline Engines, Diesel
Engines, Drive Train, Brakes, Suspension and
Steering, and Preventative Maintenance and
Inspection.*

## CONTINUED EDUCATION

**Powered Industrial Trucks: Developing a Training Program**
OSHA Regulations - April 18, 2006
Ohio BWC-Division of Safety & Hygiene
Columbus, Ohio

**NAPARS – 40 Hour Commercial Vehicle Course**
Maine State Police Headquarters
Augusta, Maine
May 15-19, 2006

**Understanding & Protecting Your Hispanic / Latino Workforce**
August 1, 2006
Ohio BWC- Division of Safety & Hygiene
Columbus, Ohio

**14th Annual T.I.D.A. Industry Seminar**
Memphis, TN
October 11, 12 & 13, 2006

**Commercial Vehicle Brake Safety Symposium**
Commercial Vehicle Safety Alliance (CVSA)
Indianapolis, Indiana
December 5-7, 2006

**Conmet – Pre-Set Hub Training**
April 24, 2007

**Train the Trainer**
Proper Training Techniques
May 3, 4, 2006 Ohio BWC
Division of Safety & Hygiene
Columbus, Ohio

**Accident Analysis**
Root Cause & Prevention
Ohio BWC Division of Safety &
Hygiene May 25, 2006
Columbus, Ohio

**Lockout/Tagout & Other Safety
Related Practices – OSHA Regulations**
Ohio BWC
Division of Safety & Health
August 21, 2007
Columbus, Ohio

**Temporary Traffic Management**
Ohio BWC – MUTCD & OSHA
Division of Safety & Health
August 30, 2007
Columbus, Ohio

**Ohio Safety Congress -** Federal Motor Carrier Safety Regulation - Update
April 1& 2, 2009         Disabilities and the Truck Driver
                        Load Securement: How a loose load can ruin your day & Are you safe for Travel

**Ohio Safety Congress –** State & Federal Motor Carrier Regulation Update
March 30, 2010        OSHA Required Training for General Industry
                     CSA 2010 Update
                     Worker Comp Claims – Trucking Industry
**State of Alabama Department of Public Safety –** Alabama Metal Coil Certification 5/5/2009
                                      General Cargo Securement Standards

**U.S. DOT/PHMSA –** Bulk Package Safety Training Seminar – May 6 & 7, 2009 – Columbus, Ohio
                   Hazmat Regulations, Packaging, Loading, Tankers

**NAPARS -** "Heavy Vehicle Crash Reconstruction" – October 7, 8 & 9, 2009 – Ocean City, MD.
           18 ACTAR CBU's
**OTA -** Maintenance Council - Wheel Ends - Stemco Hub Caps, Seals, and Wheel Bearings. April 13, 2010
        Stemco Total Quality Maintenance Program

**OSHA 1926 Construction Standards – Mandated Training 2001-2005**
Over 4 years direct employment in construction industry received 40 hour, 30 hour, 10 hour, 8 hour yearly
refreshers on hazardous materials and substances, hazardous waste, hazard communication, confined space,
fall protection, lock-out/tag-out, cranes/hoist, personal protection, material handling and storage, aerial lifts,
hand and power tools, welding and cutting, signs, and barricades and traffic control and other safety issues.

**U.S. DEPARTMENT OF TRANSPORTATION/TRANSPORTATION SAFETY INSTITUTE COURSES**
DOT/TSI Accident Countermeasures for Management -5/30/2007
DOT/TSI Defensive Driving for CMV Drivers - 6/1/2007
DOT/TSI Commercial Driver's Regulations - 6/1/2007
DOT/TSI Driving Commercial Motor Vehicles: Rules of the Road - 6/02/2007
DOT/TSI Driver's Guide to Driver Qualification Regulations - 6/2/2007
DOT/TSI Driver's Guide to Inspection Requirements - 6/3/2007
DOT/TSI Safety Fitness Rating Process and SafeStat: Getting the Score - 6/5/2007
DOT/TSI Driver's Guide to Driving CMVs - 6/5/2007
DOT/TSI Financial Responsibility for Property-Carrying Motor Carriers - 6/6/2007
DOT/TSI Driver's Guide to CDL Requirements - 6/6/2007
DOT/TSI Inspection, Repair, and Maintenance for Motor Carriers - 6/7/2007
DOT/TSI Motor Carrier General Applicability: Who and When - 6/8/2007
DOT/TSI Driver's Guide to Drug and Alcohol Regulations - 6/8/2007
DOT/TSI Drugs and Alcohol: Keeping it Straight - 6/9/2007
DOT/TSI Driver's Guide to Hours of Service - 6/10/1007
DOT/TSI Parts and Accessories Necessary for Safe Operation - 6/10/2007
DOT/TSI Hours of Service for Safety Management Personnel - 6/11/2007
DOT/TSI Motor Carrier Driver Qualifications - 6/11/2007
DOT/TSI Master Certificate –Professional Driver's Safety Compliance Program 6/10/07

**Commercial Drivers License** -- Ohio Class A with S, T, P, & X Endorsements for School & Passenger Bus, Doubles-Triples, Tanker/Hazardous Materials. TSA background check (HME)

**Employer OSHA Annual, Specific & Refresher Training** - Construction Safety & OSHA 1926 Construction Regulations 2001-2005

**Employer and DOT Annual, Specific & Refresher Training** – Transportation & Workplace Safety, DOT& OSHA 1910 Regulations - 1967-2005

**ARC NETWORK MEMBER #ARC0512**
**Member – The ATA Maintenance & Technology Council (TMC)**

## PUBLICATIONS

1. **Article on Air Brakes and Tractor Trailer Accidents**
   a. Wheeling News Register Newspaper
   b. Published: June 13, 1989

2. **Article on Commercial Truck Safety**
   a. Wheeling News Register Newspaper
   b. Published: September 25, 1989

3. **Truck/Tractor Trailer Brakes and Accident Reconstruction**
   a. www.trucxpert.bizhosting.com
   b. December 10, 2002
   c. Published: March 25, 2003  accidentreconstruction.com
   d. Accident Reconstruction Newsletter vol. V Issue 3

4. **Performance Based Brake Testers**
   a. www.trucrite.7p.com
   b. February 25, 2003
   c. Published: March 17, 2003 fleetxchange.com

### TRAINING MANUALS PUBLISHED

1. Modern Trucking Forensic Guide and Training Manual - 238 Pages
   a. Published: April 1, 2004
   b. Reed Transportation Service Inc.

2. Modern Trucking Air Brake Training Guide – 100 Pages
   a. Published: April 1, 2004 & 2006
   b. Reed Transportation Service Inc.

3. Law Enforcement Reconstruction & CMV/Tractor -Trailer Issues 99 Pages
   a. Published: April 1, 2004 & 2006
   b. Reed Transportation Service Inc.

## PUBLICATIONS CONT.

5. **General Air Brake Tolerance and Procedures**
   a.  www.trucrite.7p.com
   b.  February 25, 2003
   c.  Published: March 17, 2003 fleetxchange.com

6. **The Employer Is? PEO's - Lease Drivers**
   a.  www.trucxpert.bizhosting.com
   b.  March 8, 2003
   c.  Published: March 21,2003 trucksafety.org

7. **Air Brakes – Automatic Slacks not Automatic**
   a.  www.trucrite.7p.com
   b.  May 29, 2003
   c.  Published: July 7, 2003 fleetxchange.com

8. **Truck Crash Reconstruction**
   **"OBC" / "GPS" / "ECM'S"**
   a.  www.accidentreconstruction.com
   b.  Published: October 25, 2003
   c.  Accident Reconstruction Newsletter vol. V Issue 10

9. ON THE BERM
   **"Highway Work-Zone Crashes"**
   TRAO Newsletter
   Volume 9, Issue 3
   March 1, 2005

10. ON THE BERM
    **"Crashes and Warning Devices"**
    TRAO Newsletter
    Volume 9, Issue 4
    April, 2005
                **CONT.**

15. **EDD FOR THE TRUCKING INDUSTRY**
    a. www.accidentreconstruction.com
    b. Published December 18, 2006
    c. Accident Reconstruction Newsletter
       Volume Eight, Issue 11

16. **Commercial Vehicle Towing, Storage Fees and Payment in Accident Situations**
    a. Towing and Recovery Association of Ohio-Newsletter (TRAO)
    b. Published August 18, 2008
    c. Volume 12 Issue 8 August 2008

17. **ECM & SPEED DATA**
    a. www.accidentreconstruction.com
    b. Published September 2, 2008
    c. Accident Reconstruction Newsletter
       Volume 10 Issue 96

## TRAINING MANUAL – CONT.

4. Annual Inspection Training Guide
   a. Published: November 4, 2006
   b. Reed Transportation Service Inc.

## PUBLICATIONS CONT.

11. IN THE BAY
    **" CMV Annual Inspections"**
    TRAO Newsletter
    Volume 9, Issue 12
    December 1, 2005

12. ON THE BERM
    **"FMCSR / CDL Training Update "**
    TRAO Newsletter
    Volume 10, Issue 3
    April 27, 2006

13. **AIR BRAKE ANALYSIS AND ACCIDENT INVESTIGATION/RECON.**
    a. www.accidentreconstruction.com
    b. Published: September14, 2006
    c. Accident Reconstruction
       Newsletter Vol. Eight, Issue 8

14. **General Air Brake Tolerances and Procedures**
    a. www.accidentreconstruction.com
    b. Published: October 20, 2006
    c. Accident Reconstruction April 1, 2005

18. **GPS Positioning/Tracking System**
    **Accuracy & Reliability**
    a.www.accidentreconstruction.com
    b. Published April 8, 2009
    c. Accident Reconstruction Newsletter
       Volume 11, Issue 99

19. **LED LIGHTING**
    a. Pennsylvania Towing Association
    b. Published April 20, 2009
    c. The Keystone Cable Newsletter 4/09
    d. www.trucrite.7p.com

## PUBLICATIONS - CONTINUED

**20. CARGO & SECUREMENT**
  a. www.accidentreconstruction.com
  b. Published: February 15, 2010
  c. Accident Reconstruction Newsletter
     Volume 12 Issue 101

**22. Air Brakes & Reconstruction**
  **New Regulations & Technology**
  a. www.accidentreconstruction.com
  b. Published April 8, 2011
  c. Accident Reconstruction Newsletter
     Volume 13 Issue 104

**21. TRUCK TRACKING & BUSINESS RECORDS USE**
  a www.accidentreconstruction.com
  b. Published: November 4, 2010
  c. Accident Reconstruction Newsletter
     Volume 12 Issue 103

## PRESENTATIONS

**Commercial Drivers License Seminars** - Statewide Ohio 1989-1992 for County Engineers Assn., Ohio State Building Construction Trades Training Foundation, ODOT, and The Ohio State University, Technology Transfer Center.

**Seminar** – Introtech Crash Reconstruction Services, Grafton, Ohio
      October 9, 2003, Modern Trucking Technology

**Guest Lecture** – Ohio Peace Officer Training Academy – London, Ohio CMV Reconstruction Class
      December 4, 2003, Modern Trucking Technology

**Guest Instructor** – Ohio Peace Officer Training Academy, London, Ohio CMV Investigation and Inspection 40 hour class May 17-21, 2004

**Presentation** - Stark County Academy of Trial Lawyers, November 19, 2004. Using "Black Box" Technology in Truck Collision Cases

      Lake County Bar Association – Mentor Ohio
      CLE Luncheon – Speaker – Pre-suit Litigation – Modern Trucking & Communications
      June 28, 2006

**Training Clinics** – NAPA Auto Parts, Heavy Duty Sales, Columbus, Ohio District
      Air Brakes - Columbus, Ohio – September 8, 2005
      Air Brakes - Dayton, Ohio – October 14, 2005

**CLE Training** - Cuyahoga County Bar Association, Cleveland, Ohio - Commercial Vehicles:
Presentation      Understanding Liability Cases December 29, 2005

**CLE Training** - Lorman Education Service - Trucking Litigation & D.O.T. Regulations in Ohio
Presentation      January 23, 2007 - Columbus, Ohio

**CLE Training** – Ohio Association for Justice – Trucking Accident Litigation
      September 13, 2012 – Fairborn, Ohio

**ARBITRATION – FOUR APPEARANCES** – John Lavelle, Athens, Ryan Fisher, Cleveland,
      Mark DiCello, Mentor, Dave Laite, Cincinnati

**EXPERT TESTIMONY** – *Testified in State and Federal Courts in West Virginia, Ohio, Texas, Michigan, Kansas, New Jersey, New Mexico, Florida and Connecticut.*

# EXHIBIT "E"

Case 4:14-cv-01051-MEM   Document 44   Filed 05/13/16   Page 65 of 72

DAVID W. BAYER                                    December 03, 2014
PASTUSZEK vs. ELECTROLUX HOME PRODUCTS                        1–4

**Page 1**

```
 1           IN THE UNITED STATES DISTRICT COURT
 2         FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
 3   --------------------------x
     DAVID PASTUSZEK & BRENDA  :  NO. 4:14-CV-01051-MEM
 4   PASTUSZEK, h/w,           :
              Plaintiff(s),   :
 5                            :
                              :
 6          v.                :
                              :
     ELECTROLUX HOME PRODUCTS, :
 7   INC., et al.,            :
              Defendant(s).   :
 8   --------------------------x
 9                  - - -
                December 3, 2014
10                  - - -
11        Videoteleconferenced deposition of DAVID
12   W. BAYER, held at the law offices of DICKIE
13   McCAMEY & CHILCOTE, P.C., Plaza 21, Suite 302,
14   425 North 21st Street, Camp Hill, PA 17011,
15   beginning at 11:07 a.m., on the above date,
16   before Denise D. Bach, a Registered Professional
17   Reporter and Notary Public.
18
19
20
           ESQUIRE DEPOSITION SOLUTIONS
21              1835 Market Street
                   Suite 2600
22         Philadelphia, Pennsylvania 19103
                 (215) 988-9191
23
24
```

**Page 2**

```
 1   APPEARANCES:
 2
 3        GALFAND BERGER, LLP
          BY: RICHARD M. JUREWICZ, ESQUIRE
          Suite 2710
 4        1835 Market Street
          Philadelphia, PA 19103
 5        215.665.1600
          rjurewicz@galfandberger.com
 6        --Representing the Plaintiff(s)
 7
 8        DICKIE McCAMEY & CHILCOTE, P.C.
          BY: AARON S. JAYMAN, ESQUIRE
 9        Plaza 21, Suite 302
          425 North 21st Street
10        Camp Hill, PA 17011
          717.731.4800
11        ajayman@dmclaw.com
          --Representing the Defendant(s)
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**Page 3**

```
 1                    I N D E X
 2   WITNESS                                    PAGE
     DAVID WALTER BAYER
 3   By Mr. Jurewicz                              5
 4
             E X H I B I T S
 5
     MARKED        DESCRIPTION               PAGE
 6
     Bayer-1    Electrolux Warehouse           48
 7              Appliance Handling Training
                Manual
 8
     Bayer-2    Dedicated Contract Services    59
 9              Carrier Agreement
10   Bayer-3    Standard Work Sheet            82
11   Bayer-4    Standard Operating Procedure   92
12   Bayer-5    8/26/13 Bill of Lading, Five  103
                Pages
13
     Bayer-6    8/26/13 Bill of Lading, Two   103
14              Pages
15   Bayer-7    8/26/13 Bill of Lading, Three 103
                Pages
16
     Bayer-8    8/26/13 Bill of Lading, One   109
17              Page
18   Bayer-9A/E Color Photocopies of          120
                Photographs of Load
19
     Bayer-10A/E Color Photocopies of         120
20               Photographs of Load
21   Bayer-11    Color Photocopies of 11      134
                 Photographs of Merchandise in
22               Distribution Center
23
24
```

**Page 4**

```
 1            DEPOSITION SUPPORT INDEX
 2
 3     DIRECTION TO WITNESS NOT TO ANSWER
 4   Page  Line      Page  Line      Page  Line
 5   127    8
 6
 7
 8     REQUEST FOR PRODUCTION OF DOCUMENTS
 9   Page  Line      Page  Line      Page  Line
10   (None)
11
12
13              STIPULATIONS
14   Page  Line      Page  Line      Page  Line
15    5     2
16
17
18              QUESTIONS MARKED
19   Page  Line      Page  Line      Page  Line
20   (None)
21
22
23
24
```



DAVID W. BAYER                                        December 03, 2014
PASTUSZEK vs. ELECTROLUX HOME PRODUCTS                        81–84

Page 81

1  drivers/employees are safe in handling and
2  transporting a product; my interpretation.
3      Q.    Is a shipper involved in that or
4  is it just between the carrier and the customer?
5      A.    The carrier and the customer I
6  would assume primarily, even though we have our
7  own rules and regulations as a shipper to ensure
8  the fact that we're providing our products to
9  them in a safe manner.
10     Q.    And a safe manner includes not
11 only the end customer, but the driver
12 transporting a load as well, right?
13     A.    I would assume, but, again, I
14 don't have responsibility for the driver, so I
15 really can't speak for the driver or the
16 carrier.
17     Q.    But Electrolux does have
18 responsibility for the proper securement of the
19 load before it's tendered to the driver,
20 correct?
21     A.    That is correct.
22     Q.    And aside from the CSA program,
23 are you familiar with the SMS program, safety
24 measurement system?

Page 82

1      A.    I've heard of it, but I'm not
2  familiar with it, Rick.
3      Q.    Do you have an understanding of
4  what entities the safety measurement system
5  program would apply to?
6      A.    No, I do not.
7      Q.    You want to pull out the standard
8  worksheet?
9      A.    I have it.
10         (Exhibit No. Bayer-3, Standard
11 Work Sheet, was marked for identification.)
12 BY MR. JUREWICZ:
13     Q.    And this has been marked as
14 Exhibit 3 for the record.
15         You're familiar with this standard
16 worksheet?
17     A.    Yes.
18     Q.    And was this a standard worksheet
19 that applied to all Electrolux distribution
20 centers as of August of 2013?
21     A.    I would assume that it is, yes.  I
22 can't speak for every facility because I don't
23 oversee them, but I know this is the standard
24 worksheet that I use in the facilities that I'm

Page 83

1  involved in.
2      Q.    And were you involved in creating
3  the standard worksheet?
4      A.    In this particular one, I was
5  involved.  I had some input, yes.
6      Q.    And who was involved in actually
7  creating this standard worksheet?
8      A.    This was created by one of our
9  employees that works for one of our distribution
10 centers.  I'm not sure where it materialized out
11 of.
12     Q.    Do you remember the name of the
13 employee that created it?
14     A.    I do not.
15     Q.    What's the purpose of the standard
16 worksheet?
17     A.    Basically so that our associates
18 all understand how to properly load a trailer.
19 This particular worksheet is for an outbound
20 loading.  We have them for all functions of all
21 jobs in the warehouse, loading, put-away,
22 et cetera.  This is a standard format for, in
23 this case, loading of a truck.
24     Q.    And was it the expectation of

Page 84

1  Electrolux that all employees that worked in
2  shipping would follow the requirements or
3  guidelines set forth in the standard worksheet
4  that's been marked as Exhibit 3?
5         MR. JAYMAN:  Objection to the
6  form.
7         You can answer, Rick (sic).
8         THE WITNESS:  Yes.
9         MR. JUREWICZ:  You mean Dave.
10        MR. JAYMAN:  Dave.
11        THE WITNESS:  Yes.  Yes, they are
12 all inspected.
13 BY MR. JUREWICZ:
14     Q.    The cell layout, did you review
15 those pictures before they were incorporated
16 into the cell layout?
17     A.    Did I personally review them?
18     Q.    Yes.
19     A.    I did not.  I did not personally
20 review them.
21     Q.    But you're familiar with the four
22 photographs?
23     A.    Familiar with what, Rick?  I'm
24 sorry.



DAVID W. BAYER
PASTUSZEK vs. ELECTROLUX HOME PRODUCTS

December 03, 2014
109–112

1    A.    That's exactly it.  Seven
2  microwaves for a total weight of 427 pounds.
3    Q.    And then if we go to the document,
4  it's Bayer-6, but it's Stop 2 of 4 -- are you
5  with me?
6    A.    I'm with you.
7    Q.    -- on the second page, that lists
8  what units were part of that second stop and it
9  included one electric range that weighed
10  225 pounds, three refrigerators, with a gross
11  weight of 580 pounds, right?
12    A.    Correct.
13    Q.    And then one unit of a CRTS oven.
14  What is that?
15    A.    It's a certain type of oven.
16    Q.    And then one unit of the, what
17  looks like a washer?
18    A.    Yes.
19        (Exhibit No. Bayer-8, 8/26/13 Bill
20  of Lading, One Page, was marked for
21  identification.)
22  BY MR. JUREWICZ:
23    Q.    By the way, with the bill of
24  lading, how many copies would there be?

1    A.    There's one that's given to the
2  driver for the customer and there's one kept
3  back at the facility.
4        MR. JAYMAN:  What number is this, 8?
5        MR. JUREWICZ:  Eight.
6  BY MR. JUREWICZ:
7    Q.    And the driver's copy, would the
8  driver's copy also have the supplement to the
9  bill of lading?
10    A.    Yes.
11        MR. JAYMAN:  Dave, on the record,
12  Rick just produced a copy of the one-page
13  missing bill of lading.  I can get this scanned
14  in and e-mailed to you.  Is that all right?
15        THE WITNESS:  Sure.  Whatever you
16  want to do, if you think it's relevant for me to
17  see it.
18        MR. JAYMAN:  He's going to ask you
19  a couple questions about it.  I'll get it
20  scanned in and we'll get it sent to you.  We'll
21  go off the record for a second.
22        (Whereupon, a discussion was held
23  off the record.)
24  BY MR. JUREWICZ:

1    Q.    All right.  This has been marked
2  as Exhibit Number 8.  And it says "Stop 1 of
3  4-part stop."
4        Based upon your review of the
5  other three exhibits, bill of ladings that have
6  been identified 5, 6 and 7, is this now the
7  missing piece, at least with respect to the
8  first page of that first stop?
9    A.    Yeah, it appears this is the very
10  first one and it -- but it doesn't have the
11  supplemental bill of ladings which specified
12  those units, those 19 units -- or 14.  Excuse
13  me.  It doesn't break it down like the other
14  three.  It just has the top bill of lading.
15  That's all I see.
16        MR. JAYMAN:  Yeah, it was one
17  page, Dave.
18        THE WITNESS:  Okay, Okay.
19  BY MR. JUREWICZ:
20    Q.    Up at the top right-hand corner,
21  it reads, "Seal intact."
22        I'm not sure whose handwriting
23  that is.  What does that indicate?
24    A.    That means that the sealed number

1  noted on the bill -- on this bill of lading was
2  intact when it got to the first stop.  In other
3  words, the seal was not broken.  That's another
4  reason why we do that is to ensure the fact that
5  the load was not tampered with.
6    Q.    Which means that from the time the
7  load was loaded, brought to the shack and the
8  seal put on by the guard, at no time would
9  Mr. Pastuszek, or whoever the driver was of this
10  bill of lading, had been able to gain access to
11  the cargo or the contents inside the trailer,
12  otherwise, the seal would have been broken,
13  correct?
14    A.    That's correct.
15    Q.    Were you -- the bill of lading
16  that's listed 8/26/13, does this indicate at
17  what time of the day the merchandise that's
18  listed in the bill of lading was, in fact,
19  loaded onto the trailer?
20    A.    It does not.
21    Q.    Are loads sometimes loaded one day
22  and then the driver will pick up or sign for the
23  load and then check it out the following day?
24    A.    In most cases, with J.B. Hunt,

# EXHIBIT "F"

BAYER-4

12/3/14

Denise Bach, RPR

| ELECTROLUX – 49X | | |
|---|---|---|
| Document No.<br>SOP-7.5.1.1650 | Title:<br>Always And Never Product Handling Guidelines | Effective Date:<br>11/04/2012 |
| Procedure Owner: Warehouse Manager | | |
| Created Date: 10/04/2012 | Page 1 of 4 | |

| | |
|---|---|
| Approval: Warehouse Manager, Pottsville RDC | Approval: Operations Manager, Pottsville RDC |

## 1.0 PURPOSE

This instruction provides the fundamental practices for handling appliances to minimize risk of damage.

## 2.0 SCOPE

This instruction is to be used for all clamp and basiloid trucks in operation at Electrolux – Pottsville.

## 3.0 REASON

## 4.0 ROLES AND RESPONSIBILITIES

The facility managers, supervisors, and team leads have the responsibilities and authority to implement this work instruction.
All employees at the facility have the responsibility ti ensure this work instruction is followed.

## 5.0 REFERENCE DOCUMENTS

There are no reference documents for this SOP.

## 6.0 PROCEDURES - ALWAYS

### Product Clamping Guidelines, Always:

6.1 Always pay attention to the Carton Graphics, as it tells you how to handle that unit from that side of the carton and with that equipment.
6.2 Always use the proper clamp force setting. Too little force can lead to product slippage and too much force can induce product damage.
6.3 Always clamp straight on the product. Always keep even spacing on both sides of a unit before Clamping.
6.4 Always clamp no higher than 2" off the bottom and across to the opposite corner without going past The corner, except when carrying four, then 6" on top of the load.
6.5 Always carry products with zero mast tilt (Keep blades level). Mast tilt can cause the edge of a unit to Hit the floor and induce product damage.

| Document No.<br>SOP-7.5.1.1650 | Title:<br>Always And Never Product Handling Guidelines | Effective Date:<br>11/04/2012 |
|---|---|---|
| Procedure Owner: Warehouse Manager | | |
| Created Date: 10/04/2012 | | Page 2 of 4 |

## 6.0 PROCEDURES – ALWAYS (CONT.)

6.6 Always stack corner on top of corner – EXACTLY – REMEMBER – strength is corner to corner.
6.7 Always gently set units on top of another without forcing down into the bottom units. It is okay to release
With ½ clearance.
6.8 Always carry products on a wood pallet with a fork attachment or clamp as allowed by graphics. If
Clamping a palletized product it must be clamped above the pallet base.
6.9 Always inspect clamp rails to see that they are clean and properly lubricated. Dirty and dry clamp rails
Significantly reduce hydraulic efficiency resulting in lower clamp forces.
6.10 Always back out of stow after stacking product down, and then lower your clamps.

### Loading/Unloading Guidelines,Always:
6.1 Always use care when pushing product(s) with clamp blades against trailer walls. Always make sure
Your clamp blade is positioned flat against the front and rear corner post. Using clamp blades to push
Products against the side of a trailer can result in side panel damage,
6.2 Always secure loads with film wrap, dunnage, or blocking while loading the trailer and before
Closing the trailer doors. Rows behind the rear trailer axle are particularly prone to load shift

### Manual Product Handling Guidelines, Always:
6.1 Always follow carton graphics and approach the appliance from the approved side
6.2 Always use a properly maintained appliance dolly.
6.3 Always use a standard appliance dolly with padded vertical supports and a tongue not longer than six
Inches. Use of a non approved dolly can induce dents or damage to the underside of the appliance.
6.4 Always use caution when turning product balanced on appliance dolly. Impact with adjacent objects
May cause appliance damage.
6.5 Always stack products together that have similar footprints. Aligning corner posts will ensure safe
Stacking and prevent damage during transport.
6.6 Always place corrugated slip sheets between appliances when stacking smaller products on larger
Products.

| Document No.<br>SOP-7.5.1.1650 | Title:<br>Always And Never Product Handling Guidelines | Effective Date:<br>11/04/2012 |
|---|---|---|
| Procedure Owner:  Warehouse Manager | | |
| Created Date: 10/04/2012 | | Page 3 of  4 |

## 6.0 PROCEDURES - NEVER

6.1  Never transport products outside the bounds of the clamp platens.  Two tiers of cook tops, and microwaves may be transported above the platen if they are secured with stretch film.  *This can lead to product falling out of the clamp causing personal harm or product damage.*  __EXCEPTION:__ No film wrapping is required while loading or unloading a trailer. This is due to the slow speeds and minimal distance moved.

6.2  Never push products into other products or stationary objects.  This includes other products, walls, trailer nose, etc.  *A clamp truck can exert 4000 lbs. of total force into a load with very little forward momentum.  Even at very slow speeds (one inch per second), a spike in impact force could damage front and back components of multiple appliances.*

6.3  Never drag product on the ground except for fine positioning in stows, bays or trailers.  *Dragging products degrades the packaging which can lead to product damage or product slip.*

6.4  Never use a 30 inch tall clamp, including tipping clamps, on any product other than refrigeration or microwaves.

6.5  Never use more clamp force than is necessary.

6.6  Never move appliances with a fork truck (unless allowed by graphics).

6.9  Never drive forward unless getting product, or loading truck.

### Loading Guidelines, Never:

6.1 Never turn product within the clamp or trailer contrary to carton graphics.  *Units are designed to and tested to standards.  The carton graphics represent these standards.*

6.2 Never prone/magnum load any product without supervisor approval.  *Products that are not designed to be prone loaded will be damaged if they are loaded in this manner.*

6.3 Never stack a larger footprint on a smaller footprint. A heavy unit should never be placed on top of a lighter.

6.4 Never place palletized product next to other products in load without properly blocking skid.

| Document No. | Title: | Effective Date: |
|---|---|---|
| SOP-7.5.1.1650 | Always And Never Product Handling Guidelines | 11/04/2012 |
| Procedure Owner:  Warehouse Manager | | |
| Created Date: 10/04/2012 | | Page 4 of 4 |

## 7.0 TIMING AND FREQUENCY

As Needed

## 8.0 DOCUMENT / RECORD RETENTION

None

## 9.0 FORMS / REPORTS

None

## 10.0 QUICK REFERENCE

None

## 11.0 RELATED PROCEDURES

None

## 12.0 DOCUMENT HISTORY

This document was created on October 10th, 2012